CLYDE LANCEY, Appellant, v. LOREN D. SHELLEY et al., Appellees.

No. 45759.

MARCH 17, 1942.

REHEARING DENIED AUGUST 11, 1942.

Frank W. Davis and Davis, McLaughlin &· Hise, all of Des Moines, for appellant.

Carl A. Burkman and Royal & Royal, all of Des Moines, for appellees.

HALE, J.—On October 21, 1940, plaintiff filed in the Polk district court a petition for writ of habeas corpus, asking the

custody of Phillip Morris Lancey, and alleging that he is the father and natural guardian of said minor. As the case is entitled in the father's name, he will hereafter be referred to as plaintiff.

Plaintiff alleges a decree of divorce in Wapello county, whereby the care and custody of the minor was awarded to his mother, Velda Lancey, who died in Des Moines in 1940; that Phillip Morris Lancey is 4 years of age; that at the time of her death Velda was making her home in Des. Moines with the defendants, Loren D. Shelley and Edith Shelley, who are now restraining the person and liberty of Phillip Morris Lancey in said county. Plaintiff further alleges that said restraint is illegal, and makes the usual averments of an application for writ of habeas corpus. The defendants filed answer on the 28th of October 1940, admitting some facts and·denying other material allegations. The answer alleges an oral agreement with plaintiff that defendants might retain the custody of the child, who has been in their home since he was 8 months old, and that the best interests of the child would be served by leaving him in their custody, and asks for dismissal of the plaintiff's petition. The case came on for trial on October 28, 1940, in the district court of Polk county.

The plaintiff, Clyde Lancey, and his former wife, Velda, were married in Ottumwa, October 11, 1931, and were the parents of a son, Phillip Morris Lancey, born December 27, 1935. On September 1, 1936, Velda Lancey was awarded a divorce from her husand, based on allegations of cruel and inhuman treatment. The decree of divorce provided for payment by the father of $5.00 per week to the mother for the care of their child, by stipulation approved by·the decree, and the mother was awarded the custody of said child. She had been a telephone operator in Ottumwa, and after moving to Des Moines she and the child lived at the home of her half sister, Edith Shelley, and her husband, L. D. Shelley, and, after working at different employments, she obtained a position with the Bell Telephone Company. She lived at the Shelley home with her son until her death on October 12, 1940. Prior to the divorce the husband and father, Clyde Lancey, had been keeping

company with Dorothy Styre for about eight months, and after the divorce in 1936 they were married, on March 23, 1937. Before her marriage Dorothy had operated a barbecue, worked in a grocery and department store, and had for a period worked in a tavern. They lived in Ottumwa until 1939, when the plaintiff obtained a position as salesman with the General Foods Company, after a considerable period of unemployment. After some training, Lancey located in Freeport, Illinois, as a salesman for the company, and at the time his first wife died he and his second wife were in Freeport for the purpose of making arrangements to establish a home, as the testimony shows, but there was no evidence that the home, at the time of the trial, was actually established. There was evidence that the plaintiff had contributed to the support of the child, but the court failed to find, and we do not discover, that the payments were regularly made during the years 1938 and 1939. There were, however, some payments made in 1940. The plaintiff also testified that he had maintained an education policy for his son and had contributed many gifts, including clothing and some inexpensive toys. At times the plaintiff visited with his son in Des Moines, where he had a sister, and on visits to Ottumwa Velda had brought the minor child there.

The half sister and her husband testified that they were providing and endeavoring to provide the minor child with good care, treatment, religious training, and education, and that they had a great deal of love and affection for the little boy. Since Velda was employed a good portion of the day, a great deal of the care of the child fell to her sister, and it appears from the evidence that the mother was well satisfied with the care the child was receiving in the home that they occupied with their relatives. The home was a good one, and the treatment of the child by the defendants was good. Mrs. Shelley especially seemed greatly devoted to the boy, and probably assumed more care than the mother was able to give. It appears also that the mother frequently expressed her satisfaction with the treatment of the child, and various witnesses employed in the telephone office, and neighbors, testified to the attention the child received, and to his behavior. The defendant L. D. Shelley

was in receipt of a salary of $180 a month and a yearly cash bonus. It appears from the testimony that he also was deeply attached to the boy, and he, as well as others, testified that the child was disciplined and well-behaved. The home was properly furnished, part of the furniture being owned by Velda, who had brought it with her from Ottumwa. There was evidence that, while living in Ottumwa, Velda had not been treated well by the plaintiff, that she had been abused and locked out of the house, which evidence was denied by the plaintiff. There was other testimony by relatives of the plaintiff as to friendly and affectionate relations between the father and son, and some testimony as to the good character of the plaintiff.

On the 12th of November 1940, the court entered its order and decree, reciting the facts of the marriage and divorce as above set out, the remarriage of the plaintiff, and questioning the payments alleged to have been made in 1938, 1939, and 1940, finding no payments in 1939 and $30 in 1940. It was the opinion of the court, as shown by the order, that the conduct of the father was not commendable, nor had his visits and attention to the child indicated a real interest in his welfare. The court made some findings as to the former relations of the plaintiff and his second wife, and found that there was no established home. The court indicated in its decree what is no doubt true, that the future care of the minor child will devolve to a large extent on the present wife of the father if the father continues his employment. The court doubted whether the care, treatment, and supervision of the minor child under the custody of the present wife of the father would be as good as under that of the defendants, where the adjustment seems to have been very satisfactory. The court found that the writ of habeas corpus should be denied, and that it was for the best interest and welfare of the child that he remain in the care, custody, and control of the defendants. The court further in the order appointed L. D. Shelley as guardian. Afterward, on February 14, 1941, the plaintiff filed exceptions to the findings of fact made by the court, including appointment of guardian, exceptions to the failure of the court to make certain findings of fact, and motion for new trial in which he moved the court to set aside the order

and judgment. The motion for new trial and exceptions were overruled by the court on March 22, 1941, and it was directed that the order theretofore made should stand without change or modification, and this appeal is brought by the plaintiff from the judgment rendered against him and from the order denying his motion for new trial, and from all adverse orders, rulings, and judgments.

The question of guardianship is not discussed in this opinion, since there is another opinion of this court, In re Guardianship of Lancey, 232 Iowa 191, 2 N. W. 2d 787, wherein are considered the questions relating to said guardianship. We consider here only the questions arising under the petition and order in the habeas corpus proceedings.

Plaintiff's first claim of error is that the court interfered with his presumptive right to the custody of his minor child, first, because only in cases of imperative necessity may a trial court interfere with the natural right of a parent to the custody of his minor child; second, there was no evidence in the record from which the trial court could find any imperative necessity for such interference; and, third, the evidence affirmatively established a complete absence of necessity for such interference. It is true that the courts generally, and this court, have recognized the presumptive right of a father or mother to the custody of the child. This right, however, is not absolute, but must depend upon the circumstances and the conditions and surroundings of the parties. While some decisions speak of the paramount interest of the parent, we believe the general holding of this court is that the interest of the child is first to be considered. Naturally, the rights of the parent must be given full consideration.

In Smidt v. Benenga, 140 Iowa 399, 401, 118 N. W. 439, 440, the question is discussed and the court says:

"Generally speaking, the natural parents are entitled to the care, custody and control of their minor children; but they may by agreement or conduct deprive themselves of this natural right and confer it upon others. And when the scales are equally balanced, or the court is in doubt about the abstract right of

control, the interests of the child are paramount and will prevail."

Such is the holding in our recent case of Allender v. Selders, 227 Iowa 1324, 1332, 291 N. W. 176, 180, and the court therein stated, in discussing the question of presumption:

"However, as stated in some of the cases cited above, and in others, this presumption in favor of the parent, although it is a strong one, is nevertheless a rebuttable one. For reasons herein stated the parent may be deprived of that care and custody. The controlling consideration should be the present and future best interests of the child, with due regard to the natural rights of the parent." (Citing cases.)

We think the rule above stated has been uniformly held by this court in questions of this kind on applications for habeas corpus.

In Risting v. Sparboe, 179 Iowa 1133, 1138, 162 N. W. 592, 594, L. R. A. 1917E, 318, the court states:

"Recognition of what is for the best interest of the child will seldom interfere with the natural rights of the parent to the custody thereof, and never unless essential to its welfare or for the good of society. Enough has been said to indicate our disapproval of appellant's contention that the surviving parent has the absolute right to the custody of his minor child, and to express our approval of the more wholesome doctrine that, in a habeas corpus proceeding to determine the right to such custody, the primary consideration for the guidance of the court is the welfare of the child." (Citing various cases.)

See, also, Ellison v. Platts, 226 Iowa 1211, 1215, 286 N. W. 413, 414, in which the finding of the trial court is that the interest of the child will outweigh that of the mother who claimed its custody, which holding was affirmed by this court on appeal. It was there said:

"In matters of this kind, the well settled rule in this state is that the paramount consideration is the best interests of the child. This is so fundamental that no citation of authorities is

184

necessary, but see McDonald v. Stitt, 118 Iowa 199, 91 N. W. 1031; Hadley v. Forrest, 112 Iowa 125, 83 N. W. 822; and Knochemus v. King, 193 Iowa 1282, 1285, 188 N. W. 957. Many other cases might be cited to the same effect."

We think that the rule is well established in this state. See Barnett v. Blakley, 202 Iowa 1, 5, 209 N. W. 412, 414, a habeas corpus case, where the court says:

"The courts generally have departed from the original purpose of the writ, which was to determine whether or not the petitioner was being illegally imprisoned. As now used and recognized, in cases involving the custody of children, the writ of habeas corpus operates to invoke the broad powers of the court of an equitable nature, to determine the question of custody of a minor child according as the welfare and best interests of the child may require, having due regard to the legal rights of parents or others." (Citing various cases.)

See, also, Werling v. Heggen, 208 Iowa 908, 225 N. W. 952; and Jensen v. Sorenson, 211 Iowa 354, 233 N. W. 717.

Necessarily, following the rulings in these various cases, the findings in any particular case must depend upon the evidence showing the situation, condition, and other matters affecting the parties. No rule can be laid down that will determine the custody in all proceedings. The findings of the court as to facts have been heretofore referred to. We agree with the district court that the evidence fails to show the payments according to the stipulation in the divorce proceedings. We further agree that the conduct of Clyde Lancey prior to the divorce, as shown by the record, was not at all such conduct as should be expected from a husband and father. There is evidence which we find credible relating to his treatment of his first wife; and it is unquestioned, as shown by the evidence, that during the marriage and for eight months prior to the divorce he was keeping company with his present wife, which naturally resulted in neglect of the woman to whom he was married. We agree with the court further that Lancey at the present time has no established home. He has been in his present position for some time—time enough, it seems to us, if he intended that Freeport should be his perma-

nent location, to have fully settled the question of home and its permanency. We also feel that, in consideration of some aspects of the evidence, it is not absolutely certain that his present marriage is to continue. Neither the father nor his present wife admits that there is any question about the continuance of their marriage relation, but apparently that was in the mind of the wife, at least. On direct examination the wife testified that she was willing to set up and establish a home for Phillip with her husband, and that it was her intention to do so; that if they obtained the custody of Phillip Morris it was their intention to set up and establish a home at Freeport. She further said that she and Clyde had lived as man and wife for all the period since they were married, and the fact that she and Clyde had maintained separate residences during the last 13 or 14 months had been due to the unsettled condition of Clyde's business, and that she was in Freeport with him trying to find a place for a home at the date of the death of his former wife. On cross-examination, however, she testified that she had known Clyde nine or ten years, and went with him before his divorce for about eight months and knew that he was married at the time. She denied that she had consulted lawyers about a divorce from Clyde, but, in response to the question whether she had talked to a lawyer about obtaining a divorce, she said, "Not to a lawyer." She said she did not know whom she had talked to about a divorce, denied that she had papers prepared and ready to file, and denied that she had contemplated a divorce from her husband. She was asked the question, "Haven't you discussed it?" She said that she had not. "Q. Who have you discussed it with? A. Myself." She said that she had not thought of obtaining a divorce, but notwithstanding that, had discussed it with herself, but she had not thought anything about it. The indication, as shown by her own testimony, is that, while it may not be asserted that a divorce is contemplated, such a situation might arise. While it may be true that we should not anticipate that which may never occur, and the present situation of the parties should be our principal concern, yet, in as grave and important a matter as awarding the custody of a small child, there should at least be apprehension when the possibility or probability of the continu-

ance of the new custody might be in doubt. We agree with the court that the present care and supervision of the child would not be improved by a change to the custody of the father, where such care and supervision must necessarily, in any home, be largely under the control and management of the present wife, who could hardly hold the place in the boy's affections that his aunt has. From the testimony of neighbors and girls employed in the office with the mother, and from the testimony of the defendants themselves, we believe that the boy has been well cared for and treated in his present home with his aunt and uncle; that they seem to have the affection for him that a parent would naturally feel for a child; and that they are in such circumstances as to be able to give him good treatment, supervision, and education. While the question of financial ability is not of greatest importance, yet it is a matter that should be considered. L. D. Shelley has a position in which the pay is good, and it seems to have been permanent for a considerable time. The father is not so well circumstanced. As stated, we would give this little weight, but other matters to which we have referred are important.

We might refer also to the fact, which seems to be well established, that it was the mother's request that the custody remain in the sister and her husband. While it may be true that such request could not control against the rights of a divorced parent, after the death of the other spouse, in having the custody awarded by the court, yet we think it is entitled to some consideration. There could be no question that the mother, who, in this case, had a premonition of death, would be most concerned for the future of her child. This question is discussed in Jensen v. Sorenson, supra, where, in holding that the court was in error in ruling out questions relating to a dying request, the court says at page 361 of 211 Iowa, page 721 of 233 N. W.:

"The answers thus stricken tended to show such dying request. The evidence was material and competent. Though such request is not controlling or binding upon the court, it nevertheless is regarded as of great weight, and entitled to consideration."

See, also, Holmes v. Derrig, 127 Iowa 625, 103 N. W. 973; In re Guardianship of O'Connell, 102 Iowa 355, 71 N. W. 211.

The second error assigned by plaintiff is to much the same effect as we have heretofore shown, and is to the effect that the court erred in interfering with the presumptive right of plaintiff to the custody of his minor son. Plaintiff argues that only in a case of imperative necessity should such order be made. We have already discussed the rules in the preceding division, and feel that, considering the interests of the child, which, under the circumstances of this case, should be paramount, the court did not err in its ruling.

The third and fourth assignments of error were with relation to the appointment of a guardian at the time of the trial. A companion case to the present case deals with the later appointment, and we need not consider the subject further in this opinion. It is not material so far as the determination of the custody of the child is concerned. There was a later appointment of a guardian, and appeal was taken from that and our ruling thereon is found in In re Guardianship of Lancey, 232 Iowa 191, 2 N. W. 2d 787.

Motion was filed to strike from the record defendants' denial of and amendment to plaintiff's abstract of the record, and also to strike defendants' brief and argument under Rule No. 17. We do not think the delay was serious. We have had certified to us the transcript in the case. We have ruled on the case under the record presented both by the abstract and the transcript, and on the briefs and arguments of counsel, and the motion is overruled.

Habeas corpus cases such as the one before us were formerly tried as actions at law, and the effect of an order of the court in such cases was the same as that of a verdict of a jury. Our later practice, however, has been to treat them as equity cases and they are tried de novo. We give, however, due consideration here to the findings of the judge, who could see and hear the witnesses. Ellison v. Platts, 226 Iowa 1211, 1215, 286 N. W. 413, 415, supra.

Our holding is in substantial agreement with that of the

district court, that the paramount issue is the interest of the minor child, and we do not find it would be to his best interest that the child be handed over to the father; that we do not consider the child would fare as well if placed in the custody of the father and his present wife, considering all the circumstances of the case and the evidence of the parties; that the child now seems well placed, where he will have that care and supervision and that affection to which every child is entitled; that those relations have existed for some time and it would not be conducive to the welfare of the child to have them interrupted. We hold that the court was right in denying the writ of habeas corpus, and its action should be, and is, affirmed.—Affirmed.

MITCHELL, STIGER, SAGER, OLIVER, and GARFIELD, JJ., concur.

WENNERSTRUM, J., and BLISS, C. J., dissent.

WENNERSTRUM, J. (dissenting)—I find myself unable to concur in the majority opinion and therefore respectfully dissent.

The trial court, in passing upon the proceedings before it, made certain findings of fact. Upon these facts it based its conclusions in denying the right of the father to the possession of his own child. These findings of fact may be briefly summarized as follows: (1) That there is some question as to whether or not the father of the child made certain payments to his wife for the care of the child in 1938; (2) that during the year 1940 the father only paid $40 for the care of the child; (3) that the conduct of the father (the plaintiff in this action) prior to his divorce and immediately subsequent thereto is not commendable; (4) that the visits of the father and his attention to the minor child have not indicated a real interest in the welfare of the child; (5) that the father and his present wife had been keeping company at least eight months prior to the time the divorce was obtained by the child's mother, now deceased; (6) that there is at least a doubt in the mind of the court, whether the care, treatment, and supervision of the child under the custody of the present wife of the father would be as good as under that of the defendants in this case, where the adjustment seems to have been satisfactory.

It will be observed from the enumeration of the court's findings that the trial court gave particular emphasis to matters which related to the divorce action. This same approach to the question before us has been adopted in the majority opinion. It is the judgment of the writer of this dissent that the trial court, and this court speaking through the majority opinion, have not given proper consideration to the father's interest in his child and his ability to properly care for it at the present time and his willingness and desire to furnish a home for that child. It should be further observed, with all due respect to the majority opinion, that it emphasizes the facts in connection with the divorce and points out certain claimed conduct of the father and his present wife some four or five years ago, and by so doing endeavors to justify its action in giving the custody of the child to the defendants.

As noted by the majority opinion and the citation of authority there set forth, the primary question is as to what is for the best interests of the child. Upon this question we have only to look to the trial court's finding where it is disclosed that there was a doubt in its mind as to whether or not the care of the child under the custody of the present wife of the father and of the father himself would be as good as that with the defendants in this case. It seems to me that where there is such a doubt, the presumption of which the majority opinion speaks should be resolved in favor of the father.

The majority opinion makes reference to the fact that the present wife of the plaintiff, prior to her marriage to the plaintiff, worked for a short period of time in a beer tavern. None of us know the economic reasons that prompted this employment, but that fact is particularly emphasized. However, no mention is made of the fact that Loren D. Shelley, one of the defendants, states that his employment in Des Moines is that of sales-and-credit manager of the City Beverage Company. The record does not disclose the nature of the beverage sold by this concern. However, this court would be justified in concluding that this defendant, by reason of his employment, frequents taverns, in connection with his employment, to a much greater extent than the present wife of this plaintiff did during the short

period of time she was employed in a tavern. She changed her employment. The defendant is continuing this type of work and we are justified in concluding that he will continue to do so. And yet the majority concludes that it is for the best interest of the child that he remain with the defendant. The record also discloses that Loren D. Shelley, although claiming to have a monthly income of $180, plus a cash bonus at the end of the year, possesses only a limited amount of household goods, and that a portion of the furniture that is used in the Shelley home was furnished by the mother of the child and had been originally purchased by the plaintiff, Clyde Lancey. The record is entirely silent as to the accumulation of any property by the Shelleys despite the salary remuneration and bonuses Mr. Shelley claims he receives.

The father, Clyde Lancey, is shown by the record to be gainfully employed with the General Foods Corporation, which employment, at least, bespeaks credit to him in that he is not engaged in the beverage business. The record discloses that his employment provides him with an income of $140 per month and that it has given him the opportunity to establish a home. Is a father's right to the custody of his own child to be decided by the amount of money the respective litigants can earn? It seems to me there would be a gross miscarriage of justice if the father is not granted the right to have the custody of his own child and given the opportunity to assume the responsibility of rearing it. The trial court said there was a doubt in its mind as to what it should do, and, upon a reading of the record, the writer of this dissent can well see where that doubt would be justified. With that doubt in mind, because of the presumption which the courts have generally recognized, that the surviving parent should have a preference in connection with the right to the custody and care of a child, it seems to me that the doubt should be resolved in the father's favor.

There is another phase of this question which it seems would justify a reversal of this case. If the child were in the possession of the father, upon the facts presented, I do not believe that any court would hold that the state should step in and take this child away from him because it had been shown that he was not a proper person to rear it. If a court would

not do that in an action brought by the state it should not do it in this action. The preservation of family ties should be encouraged, and I see no justification under the record for the conclusions reached in the majority opinion.

In support of this dissent, reference is here made to the prior pronouncements of this court. Risting v. Sparboe, 179 Iowa 1133, 162 N. W. 592, L. R. A. 1917E, 318; Winter v. Winter, 184 Iowa 85, 166 N. W. 274; In re Guardianship of McFarland, 214 Iowa 417, 239 N. W. 702; Adair v. Clure, 218 Iowa 482, 255 N. W. 658; Allender v. Selders, 227 Iowa 1324, 291 N. W. 176.

I respectfully but earnestly dissent.

I am authorized to state that Bliss, C. J., joins in this dissent.