IN RE ADOPTION OF JANET SUE KARNS.

LOUIS KARNS, Appellant, v. ROBERT E. KINKEAD et ux., Appellees.

No. 46772.

NOVEMBER 13, 1945.

A. G. Bush and E. C. Willis, both of Davenport, for appellant.

D. J. McNamara, of Keokuk, for appellees.

GARFIELD, J.—■ This case involves the validity of a decree of adoption to which the child's father did not consent and of which he had no notice.

Plaintiff, Louis Karns, married Norma Kinkead on April 26, 1940. They lived together until about September 1st of that year, when plaintiff brought suit for divorce upon grounds which are not disclosed. The wife did not contest the divorce and it was granted on October 1, 1940. On March 1, 1941, the divorced wife gave birth to Janet Sue Karns, whose adoption is now in question. The divorce decree makes no reference to the unborn child, to any right of custody, or duty of support.

About a week after the divorce plaintiff enlisted in the Army and had not been discharged at the time of trial in March 1945. About two weeks before the child was born, plaintiff

returned on a furlough to Davenport, where his father and stepmother lived, in response to word from the stepmother regarding the expected arrival of the baby. The expectant mother was then at her parents' home in the small town of Vincennes, Lee county. Plaintiff telephoned his former wife and offered that if she would come to Davenport he would provide hospitalization or the care of his stepmother, an experienced registered nurse, during her confinement. Norma refused the offer and the child was born in the home of Norma's parents.

On September 5, 1942, Norma married one Robinson and, with the baby, left her parents' home in Vincennes and went to Alexandria, Missouri, to live with her new husband. The following month plaintiff, while on a furlough, went to Alexandria, where he saw the child for the first time. He then offered to let Norma bring the baby to the home of his father and stepmother in Davenport. He also offered her assistance, "more or less a monthly allowance for the child and her, and her husband absolutely refused that." On October 23, 1942, plaintiff left this country for military service in Africa.

Plaintiff returned from overseas about September 1, 1944, and while on a furlough went to the Kinkead home in Vincennes to see the child. The mother's parents had had the baby since August 1, 1943, when Norma and her second husband went to Montana. Plaintiff told Mrs. Kinkead he wanted to take the child for a few weeks while he was home but the grandmother refused. Thereupon plaintiff, on September 8, 1944, filed in the divorce proceeding a petition for modification of the divorce decree under which he would have custody of the child with the right of visitation reserved to the mother. There had been no hearing on this petition at the time the case now before us was tried below but we are told in plaintiff's reply argument that such a hearing was set for October 26, 1945.

In the latter part of October 1944, after plaintiff had resumed military service at Hot Springs, Arkansas, he made an allotment for the child out of his pay. About a month later checks were issued but were returned to the government and in December Mrs. Kinkead wrote plaintiff that she and her husband had adopted the child and needed no support from

plaintiff. In the meantime, on October 27, 1944, plaintiff married a young lady in the Women's Auxiliary Corps at Hot Springs.

On October 5, 1944, Mr. and Mrs. Kinkead filed in the district court of Lee county a petition for the adoption of the child, accompanied by the written consent of the child's mother signed on October 2d. No notice was given the father. On the following day a decree of adoption was entered. On February 3, 1945, plaintiff filed his petition to set aside this decree mainly because he had not given his consent. The petition alleged, however, that the court in the adoption proceeding did not have jurisdiction over plaintiff (father). Following trial the court held that consent to the adoption by the child's mother was sufficient and plaintiff's petition was dismissed. Of course, the appeal is by plaintiff.

We consider first whether plaintiff's consent to the adoption was necessary to confer jurisdiction upon the court to decree the adoption. That seems to have been the principal question at issue in the trial upon plaintiff's petition.

Section 10501.3, so far as applicable here, provides:

"The consent of both parents shall be given to such adoption unless * * * the parents are not married to each other * * * If not married to each other, the parent having the care and providing for the wants of the child may give consent."

It is clear, as the trial court held, these divorced parents "are not married to each other." The consent of both is therefore not required by the statute. In re Adoption of Alley, 234 Iowa 931, 933, 14 N. W. 2d 742, 744, and authorities there cited.

Plaintiff contends the provision that the consent of both parents is not required if they "are not married to each other" refers only to the parents of illegitimate children. Not only was no such contention made in the trial court but plaintiff's petition concedes that these parents were not married to each other within the contemplation of section 10501.3. But the argument is without merit in any event. While the opinion does not so disclose, this same contention was urged and re-

jected in our consideration of Rubendall v. Bisterfelt, 227 Iowa 1388, 291 N. W. 401. To adopt the argument would require us to hold that the provision "unless * * * the parents are not married to each other" means "unless the child was both born and begotten out of wedlock." See 10 C. J. S. 7, section 1; 7 Am. Jur. 628, section 4. We are unwilling so to distort the wording of the statute.

The trial court held that the mother was "the parent having the care and providing for the wants of the child" and was therefore authorized by the last sentence of the above-quoted statutory provision to consent to the adoption. Plaintiff's petition alleges that the mother could not consent to the adoption because her parents had had the child for about fourteen months at the time of the adoption. The contention is that in order for one unmarried parent to consent to the adoption, such parent must have the care and provide for the wants of the child at the very time of the adoption. We think this is too narrow a construction of the statute.

In determining the meaning of section 10501.3, it should be considered in the light of the whole chapter (473) and every other section therein. Wood Bros. Thresher Co. v. Eicher, 231 Iowa 550, 560, 1 N. W. 2d 655, 660; Ahrweiler v. Board of Supervisors, 226 Iowa 229, 231, 283 N. W. 889; 59 C. J. 1042, 1046, section 620. All provisions of the chapter should be considered as parts of a connected whole and harmonized if possible. Brutsche v. Incorporated Town, 218 Iowa 1073, 1081, 256 N. W. 914; In re Estate of Van Vechten, 218 Iowa 229, 234, 251 N. W. 729; Smith v. Thompson, 219 Iowa 888, 895, 258 N. W. 190; 50 Am. Jur. 367, 368, section 363.

Section 10501.2 provides in part:

"No petition shall be granted until the child shall have lived for six months in the proposed home, provided, however, that such * * * period of residence may be waived by the court upon good cause shown * * * ."

To hold, as contended by plaintiff, that an unmarried parent, in order to consent to an adoption, must have the care and provide for the child's wants at the very time of the

adoption, would nullify the requirement of section 10501.2 that the child live in the home of the adopting parents for at least six months before the petition may be granted. In order to harmonize sections 10501.3 and 10501.2 it is entirely proper to hold that consent to adoption may be given by an unmarried parent who has the care and is providing for the wants of the child at the time the child is placed with the petitioners for adoption and such care and "providing" are not merely temporary. See Seibert v. Seibert, 170 Iowa 561, 153 N. W. 160. If, therefore, the mother had the care and provided for the wants of this child, and not merely temporarily, when she placed her with the Kinkeads, she was authorized by 10501.3 to consent to the adoption.

We feel we are not justified in disturbing the trial court's finding that the mother was the parent having the care and providing for the wants of the child. Plaintiff furnished no care for the child and made no actual contribution to its support. It is true, as stated, that he offered to help the mother through confinement provided she would go to Davenport, offered help in October 1942, and, after the decree of adoption had been entered, made an allotment for the child out of his pay. Also as stated, these offers were declined. It appears, too, that plaintiff's stepmother "tried to remember" the child on her birthdays and holidays and on the two occasions she saw her. Once the stepmother sent "a snow suit, boots and shoes. and everything complete to keep her warm. * * * sent things to them in 1943 and 1944 several times—more than twice."

Until the child was eighteen months old she and her mother were in the Kinkead home. The child was then entirely cared for and supported by the mother, with the assistance of her parents. It is fairly to be inferred that such assistance as the Kinkeads furnished was at the request of their daughter. For eleven months following this period the child was cared for and supported by the mother and her second husband in Missouri. At the end of the eleven months the mother left the child with her parents, who have had her in their home since that time.

While plaintiff's military service, his offers of assistance, and the gifts from the stepmother are to be commended, it cannot fairly be said that because of these facts the mother was not the parent who had the care and provided for the wants of the child at the time she was placed in the home of the petitioners for adoption fourteen months before the petition was filed. In support of our conclusion, see In re Adoption of Alley, supra, 234 Iowa 931, 14 N. W. 2d 742, and authorities there cited.

Plaintiff argues that he was entitled to notice of the adoption proceeding in order that he might have his day in court upon the question of the necessity of his consent to the adoption and also upon the question of its expediency. While it is not claimed chapter 473 contains any provision that entitled him to notice, it is contended that notice to plaintiff was essential to due process. See, on this question, 1 Am. Jur. 644, 645, section 44; annotations 24 A. L. R. 416, 76 A. L. R. 1077. So far as the record shows, the contention now made was not urged in the court below and plaintiff is therefore not entitled to raise it here. Eysink v. Board of Supervisors, 229 Iowa 1240, 1245, 1246, 296 N. W. 376, 379; Iltis v. Gentilly, 234 Iowa 689, 693, 13 N. W. 2d 699, 701, and authorities there cited.

There is no allegation in plaintiff's petition that no notice was given him of the adoption proceeding. It is true, as stated, the petition contains the general allegation that the court did not have jurisdiction over plaintiff. But this statement seems to be bottomed on the contention that plaintiff's consent to the adoption was necessary. The trial court apparently was unaware of the contention now urged. Its ruling states "the question presented is whether the consent of the divorced applicant * * * is required by section 10501.3 of the Code of 1939, before said child could be adopted * * * ."

Furthermore, it is plain that plaintiff had his day in court, in the hearing on his petition, both on the question of the need for his consent and the wisdom of the adoption. After full hearing the court decided both issues against plaintiff. We have already upheld its decision that plaintiff's consent was not necessary. On the question of the wisdom of the

adoption, the court was "convinced that it is for the best interest of the child to remain in the home of the adoptive parents." The court could and presumably would have set aside the adoption if it felt the decree should not have been entered. The denial of plaintiff's petition was in effect a ratification of the decree of adoption. See In re Guardianship of Hruska, 230 Iowa 668, 673, 298 N. W. 664, 667, 138 A. L. R. 1359, 1364.

Plaintiff contends the finding we have just quoted was outside the issues. But it is apparent that plaintiff injected the issue into the hearing by seeking to convince the court the child would be better off in the home of his father and stepmother in Davenport until plaintiff and his second wife could establish their own home. Defendants met such evidence by testimony tending to show that the child's welfare would best be served by leaving her with them. Since plaintiff voluntarily litigated the issue, he is in no position to assert the court's decision was outside the issues. Fleming v. Fleming, 211 Iowa 1251, 1256, 230 N. W. 359; Bennett ·State Bk. v. Schloesser, 101 Iowa 571, 575, 70 N. W. 705; 5 C. J. S. 187, section 1505b; 3 Am. Jur. 419, section 873; id. 427, 428, section 876.

Nor are we prepared to interfere with the trial court's finding on this issue. The child was born in the home of her maternal grandparents and has lived there all her life except for the eleven months in Missouri with her mother. The principal criticism of the Kinkeads is that they are poor. But, of course, this is not controlling. 39 Am. Jur. 612, section 22. There is ample evidence that the child has a good home and the love and devotion of her grandparents. Plaintiff himself testified:

"She has had love and the good care within their means— all they could give her * * * When I have seen her she was nicely cared for, neat and clean * * * ."

Plaintiff's stepmother said:

"The child got the care and loving like he testified to. I haven't questioned that. The home is very respectable."

Mrs. Kinkead (age forty-seven) testified:

"I have loved her from the time she was born. I have protected her and kept her in my possession. * * * I felt she was my child and knew no other parents and I had raised her."

Norma's sister said her parents had given the little girl perfect care and a good home.

Mrs. Shinn testified:

"I * * * am acquainted with Mr. and Mrs. Kinkead and the little child. I did live right next door to them for about two years. As a neighbor I was in Mr. and Mrs. Kinkead's home very much and have had occasion to observe the home. Nobody could be better with reference to the care given this child—just like a mother. Both of them have been good to it and give her loving care. She was kept unusually clean and I would say has a fine home."

Eva Ferguson said:

"* * * have been in their home lots of times and have observed their home. I would say this little grandchild had loving care—was taken care of awfully good. I volunteered to come here and testify. The grandparents are as good to her as they can be."

Mrs. Marmain testified:

"I have been in their home in Vincennes and have seen the little child there. * * * I would say that she has a loving home. It could not be any better. She is well kept and is fond of both grandparents."

The above testimony is not disputed in any way. The finding of the trial court is, of course, entitled to weight and it had some discretion in deciding this issue. Ellison v. Platts, 226 Iowa 1211, 1215, 286 N. W. 413, and cases cited. The welfare of the child is ordinarily a controlling consideration in a proceeding of this kind. 2 C. J. S. 436, section 45d; 39 Am. Jur. 607, section 20. We have so held time and again. Lancey v. Shelley, 232 Iowa 178, 182, 2 N. W. 2d 781, 783, and cases

there cited; Paulson v. Windelow, 236 Iowa 1011, 20 N. W. 2d 470. Wooley v. Schoop, 234 Iowa 657, 12 N. W. 2d 597, upon which plaintiff relies, is plainly distinguishable from the present case in several respects.—Affirmed.

MILLER, C. J., and OLIVER, HALE, SMITH, and MANTZ, JJ., concur.

MULRONEY and WENNERSTRUM, JJ., dissent.

MULRONEY, J. (dissenting)—I respectfully dissent.

In In re Adoption of Alley, 234 Iowa 931, 14 N. W. 2d 742, so much relied upon by the majority, I voiced my dissent when the majority of this court held an adoption could be consummated without the father's consent when the record showed the father was mentally sick at the time of the divorce and the income from his property actually supported the children. The majority opinion there ignored the record of the father's income-producing property that was turned over to the children and held the mother could give his children in adoption without his consent. The decison was probably harmless in that case for there the adoption petition had been denied and the reversing opinion of the majority only directed a hearing and determination by the trial court.

Here the result is tragic. A soldier father, with four bronze campaign medals and the Purple Heart, returns from the war to find his infant daughter, born while he was in service, adopted out without his knowledge or consent. The opinion can be sustained only by holding the mother is the person who had the care and provided for the wants of the child. Yet the record shows that the father took an emergency furlough home the first time he heard that his ex-wife was to be a mother, for the very purpose of taking care of her and, I think we can assume, for the purpose of caring for the expected child, but she spurned his offer.

On his next furlough the child was nineteen months old and the record is undisputed that he offered the mother, who had married again, assistance "more or less a monthly allowance" and it was refused. He testified: "Her husband blocked that allotment."

When he next saw the child, on his return from overseas service, it was at the grandmother's and his request to take the child was refused. He then tried to reopen the divorce action to get a decree granting custody of the child to him and went back to camp. His attorneys could not locate his ex-wife for service. While in camp he made application for an allotment for the child but the allotment checks were returned and he was notified by the grandmother that she had obtained a decree of adoption. As the grandmother testified:

"When I found that he filed for the custody of the child, I came in here and filed adoption papers—I took steps to protect her which consisted in going up to this judge and having him sign the adoption procedure."

It was as simple as that. Can it be that the adoption statutes are to be used to forever deprive a soldier parent of his child, without any notice or any hearing, on the mere consent of the mother, who refused his offered assistance, when there has been no decree of any court depriving the father of his common-law and statutory right of equal custody with the mother?

What is the record with respect to the mother's being the person who had the care and provided for the wants of the child? The child was born at the grandparents' home March 1, 1941. She lived at her grandparents' home with her mother until the latter married Robinson in September 1942 and went to Missouri, taking the baby with her. The plaintiff's stepmother testified that when she saw the baby and the Robinsons in Missouri, Mrs. Robinson told her that "she had snatched the baby from her mother's home." The baby was brought back to the grandmother's home by Robinson about September or October of 1943, where it has been ever since.

The plaintiff testified:

"I left this country to go to Africa October 23, 1942, after I had seen the child at Alexandria. I stayed abroad 23½ months. I received letters that Norma Karns had abandoned the child and went to Montana with her husband and left the child in the care of the grandmother at that time. That is

what the grandmother told me when I went down there. Q. She said the child was abandoned to them? A. That is what she told me, and my stepmother, at that time.''

The plaintiff's stepmother corroborated the plaintiff when she testified:

''I next saw the child in September, 1944, after Mr. Karns came home from service and then heard the conversation between Louis Karns and the Kinkeads. Norma was not there. Mrs. Kinkead said Norma had gone away and left the child with her. She told me that Norma had never cared anything about the baby at all; and that she and her husband intended to keep the baby.''

The grandmother denied that her daughter abandoned the child. She testified:

''Q. And you say that your daughter, Norma, never abandoned this child? A. No. I did not say she abandoned it. I say she left it in my care because she could not take care of it. She was married to Tom Robinson and was in good health then as far as I know. She brought the child back to me. She sent it back. She went to the hospital but Tom Robinson brought it over to me. She said she had an operation. I don't know just what it was. It was in September. October 1st they brought her back. That would be in 1943, so she had the child about ten or eleven months. She went to St. Mary's Hospital at Quincy, Illinois, and was living with Robinson then. I never asked her to take the child after she got out of the hospital because she said her nerves would not let her. As far as I know, she has been unable to take it ever since. She says she is self-supporting at the present time.''

The child's mother was not present at the trial. The grandmother, testifying at the trial, stated:

.''So far as I know, Norma Karns is at Bozeman, Montana. I don't know her address. I don't think she is still living with Tom Robinson. I would rather think she is divorced.''

This is the record which the majority feel establishes that the mother was the parent having the care and providing for

the wants of the child so that she could secretly consent to the child's adoption and forever deprive the natural father of his child, even though the father was offering to care for the child and provide for its wants.

In Rubendall v. Bisterfelt, 227 Iowa 1388, 1390, 291 N. W. 401, 402, we held the mere promise or stipulation by the father to support the child was sufficient to void an adoption decree obtained without the father's consent. And there is nothing in the opinion that shows that the father carried out the stipulation or contributed one cent to the child's support. There we stated:

"Appellees argue that consent of appellant to the adoption was unnecessary because, they say, after the divorce the mother was 'the parent having the care and providing for the wants of the child'. However, the record shows the parties had stipulated [and the decree recognized] that in case a divorce was granted appellant would contribute to the support of the child and should have the right of visitation. * * * Under the circumstances it cannot be said the mother was the parent who provided for the wants of the child to the exclusion of appellant."

If a father who agrees to support a child, or is ordered to support a child, is such a parent who must consent before a valid adoption is consummated, then I feel a soldier father who offers to support his child is also such a parent who must consent before a valid adoption is consummated. The majority opinion cites the Rubendall opinion but only to dispose of a contention not disclosed in the opinion. Surely the Rubendall opinion is now overruled without direct reference.

With respect to the issue that was litigated being the same issue that the divorce court would litigate, I do not agree with the majority. The issue here was the legality of the adoption decree. Perhaps the plaintiff did introduce testimony of his good home, but the adoption statutes contemplate a different kind of hearing from the ordinary action. He should not be penalized for this. He is not asking for custody of the child. He asks that the court that has power to grant simple custody be allowed to act. After all, adoption is final and

custody may not be. The custody action may at least give him some right to support his child and to visit his child. The adoption decree takes away all rights of a father. To me it is far too drastic to render secretly against a soldier who, I think, did all he could to support his child. The decree tells him he can never see his child again or have a part in her education or support because the mother, who, under the record, evinced little interest in the child, was careful to refuse his offers of support. I would reverse.

WENNERSTRUM, J., joins in this dissent.