In the Matter of the ADOPTION OF Stephen Walter CLARK, Dennis Perry Clark, Victor Brooks Clark, Paul David Clark, and Laura Clark.

No. 53784.

Supreme Court of Iowa.

Jan. 19, 1971.

Scalise, Scism, Gentry & Brick, Des Moines, for appellant.

Jesse, Le Tourneau & Johnston, Des Moines, for appellee.

UHLENHOPP, Justice.

The question here is whether a stepmother's petition to adopt five children should be granted.

C. Walter Clark, Jr. and Margaret F. Clark were husband and wife. Mr. Clark is a teacher at Drake University. Within a space of six years, five children were born to them. The children ranged in age from three to nine years at the time the case was tried in May of 1969.

On the same faculty with Walter Clark was Truman Cross, who also was married. The Clarks had known the Crosses at another university where the two men were students. At Drake University, the two couples were together socially. A relationship developed between Margaret Clark and Truman Cross. Later Mr. Cross took a job in Washington, D.C., and apparently separated from his wife.

Eventually Margaret Clark decided she wanted to try another life and that she would leave Walter Clark and go with Truman Cross. Walter unsuccessfully tried to get her to stay. The reasons for Margaret's dissatisfaction with Walter are not shown; the background of their life together was not brought out in the present case. About August 1, 1967, Margaret left for Washington, D.C. She would not commit herself to return to Walter, but she did return in three weeks. She seemed bitter. Soon afterward she left again for Washington, where she lived with Truman. What happened to Truman's wife is not disclosed, but at some time that couple was divorced. Whether they had children does not appear.

Walter did the best he could with the five children. They all lived in the family home he is buying, and he employed sitters.

Walter decided to take legal action and in the fall of 1967 commenced a divorce

suit against Margaret. She appeared in the suit. Both parties sought custody of the children during the pendency of the suit. A hearing was held in October of 1967 on that question. Margaret's situation with Truman was brought out at the hearing, as well as Truman's past use of the drug LSD. It was also brought out that Margaret too tried the drug on one occasion. Temporary custody of the children was granted to Walter. (The present evidence indicates that while Truman did experiment with LSD, he did not use it to much extent and does not use it now.)

On December 5, 1967, Walter was granted an uncontested divorce, permanent custody of the children, securities valued at $1,800, a car, and the house and furniture. Margaret was granted some household effects and the right to visit the children on holidays as agreed by the parties and for a month each summer.

After Margaret left with Truman, Walter became acquainted with petitioner Sandra J. (now Clark), aged 24 at time of trial of the present case. This relationship parallels the commencement and prosecution of the divorce suit by Walter, but the evidence discloses no impropriety as to these individuals. Sandra was a counselor in vocational rehabilitation. When Walter met her, she was a graduate student at Drake University. The relationship was casual at first. By Thanksgiving they were better acquainted. In December of 1967, Sandra met the children.

About February, 1968, Sandra began to spend considerable time with the children. Walter had a difficult task, of course, with five children, and Sandra helped with their meals, baths, and clothing. She proved to be a capable person with the children, and a bond of affection developed between her and them.

Meantime trouble began to develop over Margaret's visitation rights. Margaret and the children love each other, and she wanted to see them. On the other hand, the visits were somewhat upsetting to the children, especially the smaller ones. Margaret and Walter jangled over times for the visits. No doubt Walter's reluctance was mainly motivated by the disturbance of the children, but we suspect that as time passed he saw the possibility of a more settled life with Sandra.

When the summer of 1968 came, Walter objected to Margaret's taking the children to Washington to be in a home where Margaret and Truman were living together. He also raised the question of LSD. Margaret had him cited for contempt, but after a conference and an agreement by the parties, Walter was exonerated of contempt and Margaret was given her month's visitation at her residence in Washington on condition she would "permit no other persons to reside at such residence nor have more than casual contact or association with said children during the period of such visitation." Margaret took the children for the month.

In December of 1968 Walter married Sandra and Truman married Margaret. Walter and Sandra remained at the same place with the children, but Truman and Margaret moved to California, where he taught in a university. Whether Truman and Margaret are still there does not appear.

Walter has a permanent position and earns about $13,000 annually. Sandra is a good housekeeper, keeps the children clean and watches over their coming and going, maintains good control of them, and is a mature mother to them. Margaret has made birthday gifts to the children of money and clothes, but does not say she supports them.

As time passed, the matter of Margaret's visitation rights continued to be a disruptive factor. Walter and Sandra agree the children should see their own mother. But they believe they should have complete responsibility for and control of the children in order to have stability in the family. Accordingly, in April of 1969, about four months after Walter and Sandra were

married, Sandra petitioned to adopt the children and Walter executed his consent. Notice was given to Margaret, and she appeared and contested the petition. The matter was tried on the merits.

At trial the facts which have been related were brought out. In addition, Dr. Paul R. Dingman testified—a psychologist who directed the Des Moines Child Guidance Center for 17 years. He recommended the adoption and explained his thinking in a way which would apparently favor adoption in numerous stepparent situations:

"It is my opinion that children can grow most favorably and most fully, psychologically, when they have for parents an entity * * *. The important thing is that the entity be clearly responsible for the child and thus, in the child's eyes able to control, protect, nourish and provide for him. Where there are confusing factors, these can make it very difficult for a child to grow adequately, and by confusing factors I would mean where the definition of the father-and-mother entity is different in the eyes of various people. Children can thrive best * * * when they don't have to be concerned about the possibility there might be other parental forces that could impinge upon them, could perhaps threaten or vitiate the effectiveness of the people they have to consider as their parents."

Margaret also testified. Her fear is loss of contact with her children. The gist of her position is found in this interrogatory and response:

"Q. Assuming this adoption is granted by the Court, do you truthfully have any fear that Walter and Sandra would prohibit you from seeing the children or prohibit the children from coming to visit you at times and under circumstances that, in their judgment, as well as taking into consideration your circumstances in that point of time, would dictate? Do you have any fear? A. Yes I do. That is why I am here. I definitely do."

The trial court denied the petition to adopt. Sandra appealed to this court.

The case contains the two major and separate issues usually found in suits of this kind, the "need for * * * consent" and "the wisdom of the adoption." In re Adoption of Karns, 236 Iowa 932, 938, 20 N.W.2d 474, 478. A conclusion one way on one of these issues does not mean that the same conclusion necessarily follows on the other issue.

I. *Necessity of Consent.* Margaret is the natural mother of these children and she objects to the adoption. Is her consent essential?

Whether, as a policy matter, a parent's consent to adoption should be essential is a much mooted question in family law. Compare majority and minority opinions in the case of In re Adoption of Moriarty, 260 Iowa 1279, 152 N.W.2d 218. At common law adoption was unknown, and under Iowa statutes from 1858 to 1927, consent was the way adoption was effected, for adoption was by deed. 7 G.A. ch. 67; Code, 1924, ch. 473. Since 1927, in Iowa and generally, adoption procedure has undergone substantial change, and the legal aspects of it now constitute a court proceeding rather than a mere conveyance.

The matter of parental consent has been examined during this change in adoption law. The basic contentions are these. On the one hand, the plea is made that no person should be deprived of parenthood of his own offspring over his objection unless the parent-child relationship has been previously terminated because of his unfitness to be a parent. This view is reflected in § 5, Uniform Adoption Act. 9 Uniform Laws Ann. at 30–32 (1957). Support for that view may be found in hardship cases in which an indigent parent not having custody, such as a poverty-stricken mother, loses a child through adoption in a jurisdiction which has relaxed consent requirements. Comment, 53 Iowa L.Rev. 751. On the other hand, the contention is advanced that giving a parent complete veto

power over adoption places the parent's desires for himself ahead of the welfare of the child; although adoption may be much better for the child, the parent can arbitrarily block it for light and transitory reasons. Thus it has been said, "The power of an absolute veto of an adoption petition by a parent should be recognized only under extraordinary circumstances, for to allow such a power in many cases might prevent the court from providing for the best interests of the child." Note, 33 Iowa L. Rev. 679, 685. In three states the only requirement is that the adoption serve the child's best interests. Fla.Stat., §§ 63.081, 63.131 (1967); Md.Ann.Code, art. 16, § 74 (1966); S.C.Code, § 10–2584 (1962). Certainly if the consent requirement is relaxed, much attention must be given in practice to the other major issue—the wisdom of the particular adoption.

In amending the Iowa adoption statute from time to time, our legislature eliminated the requirement of parental consent in a variety of situations. Code, 1966, § 600.3; Adoption in Iowa, 40 Iowa L.Rev. 228, 240–42. Since adoption is statutory, this court is not called upon to say, as a policy matter, when consent should or should not be essential except in cases falling between two statutory clauses. It is in such cases that the basic considerations are confronted which sometimes give rise to split decisions.

The commonest of these interstitial cases is the kind now before us—stepparent adoption proceedings in which the natural parent not having custody does not consent. Admittedly, the strong policy undercurrents in such situations have resulted in decisions which are not always easy to reconcile with each other. Rubendall v. Bisterfelt, 227 Iowa 1388, 291 N.W. 401; In re Adoption of Alley, 234 Iowa 931, 14 N. W.2d 742; In re Adoption of Karns, 236 Iowa 932, 20 N.W.2d 474; In re Adoption of Chinn, 238 Iowa 4, 25 N.W.2d 735; In re Adoption of Perkins, 242 Iowa 1374, 49 N.W.2d 248; Burrell v. Burrell, 256 Iowa 490, 127 N.W.2d 78; In re Adoption of El-

lis, 260 Iowa 508, 149 N.W.2d 804; In re Adoption of Moriarty, 260 Iowa 1279, 152 N.W.2d 218. These decisions fall between the clause of the statute which normally requires parental consent ("The consent of both parents shall be given to such adoption") and the clause which is claimed to be applicable here ("If not married to each other, the parent having the care and providing for the wants of the child may give consent"). Code, 1966, § 600.3.

The problem in such cases usually is, when does a divorced parent not having custody have enough care and provide enough wants under the second clause to necessitate his consent under the first clause? Rather refined distinctions have been drawn, but a couple threads run through the cases. One is that the *right* of visitation, as distinguished from *responsibility* for supporting the child, is not enough to give power to veto adoption. In re Adoption of Chinn, 238 Iowa 4, 7, 25 N.W.2d 735, 737 ("However, the agreement and decree did not require that the husband exercise any of the parental privileges given him."). The other thread is that for the parent out of custody to have veto power, he must be "materially" providing for the child's wants. In re Adoption of Moriarty, 260 Iowa 1279, 1286, 152 N.W.2d 218, 222 ("materially provided for the children"); see also In re Adoption of Ellis, 260 Iowa 508, 149 N.W.2d 804.

We think the present case is quite similar to In re Adoption of Chinn, 238 Iowa 4, 5, 8, 25 N.W.2d 735, 736, 737. There the divorce decree provided that the father "shall have the right to visit said child at all reasonable times, and shall further have the right to take said child to his home in Marcus for periods not exceeding one week in length and not oftener than once every three months." This court held, "The rights given the father to visit the child and to take her to his home for one week in each three months did not give him the care of the child within the meaning of the statute." Here, similarly, Margaret has the right to visit at holidays and

for a month each summer. But that does not give her the care of the children within the meaning of the statute.

We think the case is also similar to In re Adoption of Alley, 234 Iowa 931, 14 N. W.2d 742. There, as here, the custodial parent was awarded the family's assets in the divorce decree. Notwithstanding, the noncustodial parent was held not to be providing the children's needs.

■ Thus the decisions indicate Margaret has no absolute veto here. Moreover, we are convinced the basic position previously quoted is sound: the veto power of parents ought not to be extended by a narrow reading of the adoption statute. Note, 33 Iowa L.Rev. 678, 685. Statutory development over the past 50 years in the area of child welfare evinces growing public concern for children. We repeat, therefore, what the court has previously indicated: when the natural parents are not married to each other, the noncustodial parent does not possess power to veto adoption because he possesses visitation rights; nor does he have veto power unless he materially provides the child's needs. In re Adoption of Moriarty, supra, 260 Iowa at 1286, 152 N.W.2d at 222. Measured by that standard, Margaret's consent is not essential here.

■ II. *Wisdom of the Adoption.* The conclusion just reached makes the case much more difficult to decide, for now we must approach the issue whether the proposed adoption is a wise one. An adoption is not decreed merely because essential consents have been obtained. Rather, when those consents have been given, adoption is decreed "If * * * the court shall be satisfied * * * that the petition should be granted. * * *" Code, 1966, § 600.5. On this major issue the general principle is that "The welfare of the child is ordinarily a controlling consideration * * *." In re Adoption of Karns, 236 Iowa 932, 940, 20 N.W.2d 474, 478. See also In re Adoption of Perkins, 242 Iowa 1374, 49 N.W.2d 248. The principle is

general, but we are unable to devise a more specific one.

■ We think, however, that the children's welfare, while vital, is not the only consideration. Here, for example, we cannot ignore Margaret's ties to the children. Note, 33 Iowa L.Rev. 678, 682 ("the immediate best interests of the child, while of great importance, are not the sole consideration"). Adoption is drastic, and if this adoption is granted, Margaret's visitations will be wholly at Clarks' sufferance.

We fully realize that Margaret has wronged these children. Although we do not know what kind of husband Walter was and although Margaret did try to get custody of the children, she should not have left the children and placed them in their present situation. We thoroughly disapprove of her conduct. Yet she seems now to have stabilized her life. Is she to be damned forever for her past misdeeds, even to the extent of having her last legal tie to her children cut off? We are not prepared to go that far.

This is not a case in which a parent, after leaving his children, showed little or no heed for them. Margaret is interested in the children, tried to get custody of them, and has clamored to see them. Indeed, her persistent effort to visit the children is one of Clarks' main complaints.

Granting adoption here would mean that numerous divorced, noncustodial parents might have their tie to their children jeopardized. Surely adoptions are not to be granted wholesale over parents' objections under facts no stronger than these. If Margaret's visitation rights need to be altered, the change should not be effected by cutting off parentage but by modifying the divorce decree. Of course, we intimate no opinion on that subject.

Furthermore, we are not at all clear that adoption would promote the best interests of these children. Margaret and the children know each other and she has something to give their lives that no one else

possesses. Possibly the long range welfare of the children would be served if they had but one home and one set of parents, but not even Walter and Sandra propose that. Realizing the children love their own mother, Walter and Sandra agree the children should visit Margaret after adoption. In such circumstances, would not an ambiguous situation exist for the children? If Sandra is de facto and de jure mother, then who would Margaret be in the children's eyes? Are not these adults going to have to face up to the realities of the situation? Since the children are to see their own mother at all events, will not their interests be subserved by the adults' living their real roles: Walter as father, Sandra as stepmother, and Margaret as natural mother?

The visitations have caused some disturbance but do not appear to have been seriously upsetting. Visitations not infrequently ruffle the waters, but that seems an incident of some divorces. No easy solutions exist when families are divided. Sometimes the trouble does not arise because the children are upset but because the adults are upset. Walter, Sandra, and Margaret can reduce upsetting experiences for these children by acting maturely themselves.

The trial court observed and heard the case first-hand and decreed that the parent-child relationship between Margaret and the children should not be severed. Upon balancing the various interests, we have concluded to abide that decree.

Affirmed.

All Justices concur except REES and MASON, JJ., who dissent.

REES, Justice (dissenting).

I respectfully dissent from Division II and the result.

Margaret Clark Cross, the natural mother of the five children, is in a situation of her own choosing. She left her five children, then ranging in age from one to seven years, to establish an adulterous liaison with her paramour, which relationship later led to a marriage. Fortunately, the children later found a "substitute" mother in the person of the petitioner, who has attended their physical wants and furnished them their creature comforts now for a period of over two years. The stepchild/step-parent relationship is at best a very tenuous one, and I am firmly committed to the view that the five children who were the subject of the adoption are entitled to have their situation stabilized, and it can be stabilized only by the entry of a decree of adoption as prayed for by the petitioner here.

The majority reaches the conclusion, and I agree, that the consent of Margaret, the non-custodial parent, is not essential here; however, it seems to me that she has effectively exercised a veto power over the petition of the step-mother to adopt. The majority concludes that the "children's welfare, while vital, is not the only consideration", and while I generally agree with this conclusion, I am strongly of the opinion it should be the controlling and overriding consideration.

The trial court had the benefit of the testimony of an experienced and qualified child psychologist who unequivocally recommended the adoption in the interest of the children. We have the benefit of the testimony of the child psychologist through the medium of the record. We have been repeatedly critical of proceedings in which the testimony of psychiatrists, psychologists and social scientists is not made available to courts and juries in many cases. Yet as here, where the testimony of a qualified psychologist is made available, the court refuses to dignify it by giving it any considerable weight in its eventual determination.

The trial court's refusal to grant the decree of adoption, and this court's affirmance of such refusal, effectively relegates the petitioner step-mother to the status of

an unpaid domestic with the unhappy prospect of looking ahead to many years of serving the five Clark children and the household without the obvious satisfaction which would be hers if the parent-child relationship were to have been legally established. Meanwhile, the real mother of the children may indulge and entertain them during visitation periods without the day-to-day responsibilities of keeping the noses wiped, the raiment clean and the minor wounds bandaged, or furnishing a mother's guidance in the moral and spiritual development of her own offspring. In my judgment the best interests of the children will be served by a reversal of the trial court, and a direction to enter a decree of adoption as prayed.

I would reverse.

MASON, J., joins in this dissent.