JOHN HENRY RICHARD PAULSON, by his father and next friend L. A. PAULSON, Appellee, v. ELLA MAE WINDELOW, Appellant.

No. 46759.

NOVEMBER 13, 1945.

B. B. Burnquist, of Fort Dodge, for appellant.

Dwight G. Rider, of Fort Dodge, for appellee.

SMITH, J.—  After a study of this record we can understand the trial court's sympathetic comment:

"A matter of this kind is difficult to decide because regardless of what the decision is, someone is hurt."

We will refer to the father, L. A. Paulson, as plaintiff and as appellee. John Henry Richard Paulson, the son, will be referred to as John, as he is called that throughout the record. Defendant appellant is the sister of the boy's mother. John was born October 17, 1932, and his mother died two hours thereafter.

Prior to this, plaintiff and his wife, together with defendant, her daughter (Betty Ann), and her mother, apparently constituted an unusually congenial family group. They all lived together for a time in a home built by plaintiff in Clear Lake, Iowa, while defendant obtained a divorce. Plaintiff and his wife later moved to Hampton, Iowa. Defendant, with her daughter and mother, at first moved into an apartment in Clear Lake but soon went to Duncombe, Iowa, where defendant lived with her mother and stepfather one winter. In the spring defendant got work in Hampton and roomed with plaintiff and his wife, her daughter going to or remaining with (the record is not clear) defendant's mother.

Defendant married Mr. Windelow and the two families rented a duplex in Hampton, plaintiff and his wife living on the first floor and the Windelows, including defendant's daughter, living upstairs. Plaintiff and Mr. Windelow engaged in business together until times became too difficult and forced them out and plaintiff thereafter engaged in radio service and piano tuning on his own account.

The financial living arrangements while the parties lived together in Clear Lake and in Hampton were apparently easygoing (or even nonexistent) and the relationship entirely friendly. In Hampton, before her remarriage, defendant was employed and her sister took care of Betty Ann. She says plaintiff "was also very kind to me."

While they lived in the duplex in Hampton John was born and his mother died. There is a slight conflict in the evidence as to how the arrangement for the child's care was arrived at, if, indeed, there was any definite, express arrangement. Defendant testifies that her sister had expressed a wish that she (defendant) was to have the care of the baby. Plaintiff disclaims knowledge of this request but apparently will-

ingly acquiesced in what thereafter transpired, though he testifies: "I told her I wouldn't give him to anybody."

The baby was kept at the hospital two weeks and then, according to plaintiff's testimony, was taken "into the home" and they all took care of him. Defendant's mother and stepfather came up from the farm that winter and all lived together, "just like one big family," running "the whole duplex as one home," plaintiff's bedroom being downstairs, according to defendant's testimony.

A little later Mr. Darst, defendant's stepfather, bought a home in Hampton and they all moved into it. This included plaintiff and John, defendant and her two daughters (the second one having been born after defendant's marriage to Mr. Windelow), together with the Darsts. Defendant's older daughter was about eight years old; her second daughter, Audrey, three; and John one. Defendant and Mr. Windelow had then separated or separated sometime soon thereafter.

Mr. Darst established a $500 trust fund for John to be used for his education. Mrs. Darst was named guardian. The Darsts would spend the summers on the farm and the winters in Hampton. Defendant and her mother kept the house and defendant took in washing to help pay her share. The friendly relations continued. Defendant and her mother took care of John, undoubtedly with plaintiff's assistance. The domestic financial arrangements are not shown but apparently they continued friendly as always.

When John was about four Mr. Darst died and defendant, with her children and John, moved down to the farm (near Duncombe). Plaintiff remained in Hampton, though invited to go with the rest. There was, according to plaintiff's testimony (undisputed), no arrangement for John's care. The Darst house in Hampton was sold and the furniture (including some belonging to plaintiff) was taken to the farm. Plaintiff made frequent visits to the farm ("sometimes every week") and defendant, with the boy, would come to see him "sometimes once a month, sometimes longer." The boy would visit his father at vacation times a week at a time. Thanksgiving, Christmas, and John's birthday would be spent together on the farm.

Plaintiff did not pay with any regularity for John's support but would buy things for him at times when he needed something. In fact, he was never asked to contribute. He would help in other ways—helped with the garden, kept piano in tune and radio in repair, installed a radio in the car, helped wire the house for electricity, and sharpened the lawn mower. There was always the same friendly, family relationship, apparently without any thought of the necessity of balancing or keeping accounts. John called defendant "Mother" and plaintiff, in writing to the boy, referred to her in the same way.

Mrs. Darst died and the relationship continued. Under her will John got a third interest in the two-hundred-eighty-acre farm. Defendant succeeded her mother as trustee or guardian of the boy's property and by order of court $30 a month was allowed for his support out of his share of income.

Plaintiff remarried October 14, 1941. The visits continued about or nearly the same until somewhat restricted by gasoline rationing. It is difficult to tell from the record just when or how or why the change in the friendly relationship came. According to plaintiff's testimony it was intangible:

"After my marriage there seemed to be a little change in feeling—kind of resentment or something, and whenever we were down there they acted kind of cold, could not really get next to them."

Nevertheless, according to Mrs. Paulson's testimony, defendant and her daughters and John continued to visit the Paulsons at Hampton. Mrs. Paulson operates a beauty shop. She says she gave defendant and her daughters permanents and shampoos and cut John's hair. Defendant in return canned vegetables for the Paulsons.

Defendant disavows any ill feeling over plaintiff's remarriage. She was at first worried for fear it might mean he would want to take the boy: "I told Lloyd [plaintiff] at the time I was very happy, especially when I knew I could keep Johnny, that he was going to have a home of his own." This is not denied by plaintiff.

The break in relationship was over a comparatively trivial matter. It seems plaintiff was out on the west coast four or

five months engaged in defense work. He wrote John of an intention to buy him a pony. The plan fell through on plaintiff's return and the boy wrote him a reproachful letter. In it he said: "When mother sayes [sic] she will get me something she gets it." Plaintiff answered explaining the reasons for his failure to buy the pony.

Getting no reply for a considerable time he consulted an attorney in Hampton. As a result plaintiff and his wife drove to the Windelow home, stopping at John's schoolhouse on the way to get him.

As to what occurred there as well as at the home the evidence is somewhat in conflict. However, plaintiff made clear his purpose of taking the boy home with them. Plaintiff says the boy insisted he wrote the letter without any suggestions from anyone:

"He said no, it was his own idea, his own writing and he stuck to that. * * * We talked to him about going to our home. He said he didn't care to go. I said 'Wouldn't you like it there?' and he said, 'Yes' but he likes the farm too and would rather stay down there. I said under the circumstances the way things are going it looks to me like you better come with us; and he finally said he would go. * * * He went in to get his sweat shirt and cap. He cried some during the conversation. He felt kind of bad about it."

Defendant was not at home when they reached her house but came before they left. She invited them into the house to talk it over. In the ensuing conversation plaintiff abandoned the purpose of taking the boy at that time but later filed the present suit.

The foregoing long recital is necessary to an understanding of the situation and relationship of the parties. To it must be added some general facts from the record. No breath of criticism of plaintiff as a man and father or of his wife appears. Defendant speaks in the highest terms of his kindness to her during the years preceding the break.

On the other hand, witness after witness, including plaintiff, testifies to defendant's character as a mother to the boy. Some did not know he was not her own son until the suit

was commenced. Under the record there can be no question that the conditions under which he has been reared on the farm were ideal. His teacher and many neighbors have added their testimony to that of the parties.

I. We have here no particular conflict in testimony. Nor is there any fundamental disagreement over the applicable rules of law. The case presents an illustration of the importance of emphasis where two established legal principles seem to conflict in their application.

Appellee relies upon the father's statutory right of custody "with the resultant presumption arising therefrom" and insists the burden of proof was upon appellant to overcome it. He cites sections 12573 and 12574, Iowa Code, 1939, found in the chapter on guardianship of minors. He also cites Winter v. Winter, 184 Iowa 85, 166 N. W. 274, decided at a time when we held habeas corpus cases were not triable de novo on appeal. That rule is now changed in cases of this kind. See Ellison v. Platts, 226 Iowa 1211, 1215, 286 N. W. 413, and cases cited.

Allender v. Selders, 227 Iowa 1324, 291 N. W. 176, also cited at this point by appellee, states that the parent is presumptively best fitted to care for the child but reannounces the proposition that the presumption is rebuttable and the controlling consideration is the present and future best interests of the child. In that case we held the presumption in favor of the father as against the maternal grandparents was not overcome by the evidence.

McFarland v. Taylor, 214 Iowa 417, 239 N. W. 702, also cited, was a guardianship proceeding and upheld the right of plaintiff to the custody of his seven-year-old son, as against the maternal grandfather. It bases the decision however upon the welfare and best interests of the child and holds the presumption in favor of the father "has not been overcome."

Other cases cited are of the same general tenor. They all concede the ultimate question to be the welfare of the child.

The cases cited by appellant are (understandably) those in which we held that the presumption in favor of the par-

ent was overcome by the showing made. Lancey v. Shelley, 232 Iowa 178, 2 N. W. 2d 781. Ellison v. Platts, supra, and Jensen v. Sorenson, 211 Iowa 354, 233 N. W. 717, are illustrative. Some are earlier and on appeal the decision of the trial court was said to have the effect of a jury verdict. As we have seen, that is not the present rule.

██ There is really no conflict in the law. The presumption undoubtedly is in favor of the parent but the welfare of the child is the ultimate consideration.

Our quite recent case of Wooley v. Schoop, 234 Iowa 657, 12 N. W. 2d 597, furnishes an example of the unanimity of the cases in the statement of the general principles and the difficulty of their application. It happens to be one in which the father prevailed but the court was divided. The majority in that case concedes that the right of a surviving parent may be relinquished by abandonment, contract, or otherwise. The dissents recognize the general presumption in favor of the parent.

██ II. It is fundamentally a question of fact, or of opinion and judgment based on the facts shown. They are not in material dispute here. Without any disparagement of appellee it must be said he has waived his natural right, not by any misconduct or even intention on his part but by pursuing what at the time undoubtedly seemed to him to be a logical and natural course and one conducive to the child's best interests.

We commend the decision he then made to leave the boy with the aunt, probably in accordance with the mother's wishes and judgment. But in doing this and in acquiescing in the situation thereby created for a period of twelve years (more than three years after his own remarriage) appellee has permitted a condition to arise that in our judgment should not now be changed.

We are reluctant to disagree with the judgment of the trial court. In his findings the judge approached the question with sympathy for all persons concerned. He completely absolves appellant and her daughters from any conduct, intentional or otherwise, designed to alienate the boy from or

turn him against his father and concedes that the house and surroundings and care furnished by her are good.

Appellee in his brief urges that because the court, by stipulation, interviewed the boy privately, in the absence of all parties, we do not and cannot have the entire record before us. The only direct reference to the interview with the boy in the trial court's finding is in connection with the finding that nothing had been done or said by appellant to disturb the friendly relations between the father and son. It reports furthermore that the boy held no resentment against his father. We find nothing to justify the inference that the trial court based its decision upon anything that transpired in its interview with the boy. We assume if there had been anything important the court would have mentioned it.

We have omitted mention of many matters in the record—some important, perhaps; others less so. We have intentionally ignored the question of the boy's interest in the farm by virtue of his grandmother's will and the evidence relating to the collection and disposition of the income from it. The record does not justify an assumption that financial matters have entered into the motives or influenced the conduct and thoughts of the parties.

The testimony of the boy's teacher, his pastor, the family doctor and lawyer, and of numerous neighbors, most of whom were in a position to know, confirms us in the opinion that his life on the farm with his "mother" and her family has been close to ideal and that to change it at this formative period of his life would be wrong. Appellee and his wife have a good home in Hampton but it may be gravely doubted whether it would be suitable for a twelve-year-old boy from the farm. Mrs. Paulson pursues her profession in a part of the house. It can hardly be contended that she is in a position to replace appellant as a mother to the boy. This implies no criticism of her in any way. The wishes and feelings of the father and of the one who has been the only mother the boy has ever had must, of course, be considered but the important consideration is the welfare of the boy himself.

We see no reason why the earlier friendly relationship may not be resumed. On November 18th, shortly before the commencement of this suit, appellant wrote appellee a letter which is referred to in the trial court's opinion. We are not justified in setting it out verbatim but it expresses the hope and "a prayer that you will forget all this trouble and we can keep our little family all together and have the nice times we have always had together."

In it she says:

"John has always loved you so much and he loves us too and this is the only home he has had for twelve years * * * I promise your son will always love and respect you if I can have anything to do with him. * * * I sure have always thought of you as my brother and loved you the same way."

There is more, but what we have set out reflects, better perhaps than our long detail of facts can show, the relationship between these parties, interrupted (temporarily only, we hope) by the events leading up to this unfortunate litigation. From the record we are justified in the hope that our decision will not deprive the father and son of the mutual companionship each should have and that John will lose neither his "mother" nor father as a result.

The judgment and decree of the trial court will be reversed.—Reversed.

MILLER, C. J., and OLIVER, BLISS, HALE, GARFIELD, WENNERSTRUM, and MANTZ, JJ., concur.

MULRONEY, J., takes no part.