MARY ANN PELTON et al., minors, by their next friend, ROBERT N. PELTON, and ROBERT N. PELTON, Appellants, v. JOHN HALVERSON et ux., Appellees.

No. 47385.

(Reported in 35 N. W. 2d 759)

February 8, 1949.

Campbell & Campbell, of Newton, for appellants.

Roy L. Pell and Joe B. Tye, both of Marshalltown, for appellees.

Wennerstrum, J.—Robert N. Pelton, the father of Mary Ann Pelton and Nancy Louise Pelton, minors, brought a habeas corpus action individually, and as their next friend, against John Halverson and Bertha Halverson, the maternal grandparents who now have the custody of the minor children. The district court, after hearing, refused to grant the writ and give the custody of the children to the father. He has appealed. The plaintiff father will be hereinafter referred to as the appellant.

The minor children are twins. They were born January 30, 1938, in California, which state had been the residence and domicile of their father and mother for several years prior to the children's birth. It is still the residence and domicile of the father. The mother of the children died approximately six weeks after their birth. Within a few days after the death of the mother the maternal grandmother, Bertha Halverson, who had gone to California from Marshall County, Iowa to assist in the care of her daughter, returned to Iowa bringing with her the two baby girls. The deceased daughter's body was at that time brought to Iowa for burial. Since then the twin girls have resided with and have had the care and supervision of the

grandparents. The twins, at the time of the hearing before the trial court, were over ten years of age.

John and Bertha Halverson, the appellees, are respectively sixty-five and seventy-three years of age. It is shown that they are the owners of an eighty-acre farm in Marshall county; that the home in which they and the children live is a reasonably modern farm home; that the children are being reared under satisfactory and wholesome conditions; that they have received proper medical care and are in good health; that the children have attended school regularly and are now attending in Gilman; that they have the benefit of a school bus which passes the home of the grandparents; that the children are regular attendants at Sunday school, being taken by their grandfather or near neighbors. The evidence shows, through testimony of neighbors, that the twin girls have been properly clothed by the grandparents; that their actions disclose they have received proper training, and that the home of the grandparents is a suitable and satisfactory one in every respect.

The father is a resident of Compton, California. He is the owner of an unencumbered seven-room-modern home with four bedrooms. It is in a good residential district, convenient to grammar and high school, a junior college and several churches. The father is a chief foreman in the machine shop of the United States Rubber Company in Los Angeles and in 1947 had an annual income of approximately $5500. In 1946 his income was $4200. Following the death of the children's mother which occurred on March 13, 1938, the appellant remarried in August of 1941, his second wife being the mother of two boys whose ages at that time are not disclosed. It is also shown that during the month of December 1942 appellant and his second wife, Julia, separated and were thereafter divorced, the decree becoming final in February 1944. On November 16, 1942, the appellant enlisted in the United States navy and continued in that service until discharged in July 1945. During the time of his naval service he made an allotment of approximately $62 per month for the benefit of his twin daughters for twenty months. The appellant testified that prior to making the allotment he had purchased more than $37.50 per month in bonds

for his daughters and that he still has these bonds in the amount of $700 or $800 in his safe-deposit box. It is also shown by the record that the money received from the allotment was invested in government bonds for the minor girls by the grandparents. The appellee, Bertha Halverson, on cross-examination, admitted that other checks totaling approximately $900 had been sent by or for the appellant to pay for the deceased daughter's funeral and the care of the children. During the years that have elapsed since the children were brought to Marshall county their father has written them from time to time and has also written to the appellee grandparents. He has sent gifts to the girls on different occasions. In some of the letters to the grandparents he made inquiry relative to obtaining the custody of the children. On three different occasions he visited the home of the appellees and at such times he arrived without advising them of his contemplated visit. Each time he sought to obtain custody of the children and wanted to take them to California. On one of these visits his second wife, Julia, was with him and she indicated a desire and wish to aid in the care of the children.

On or about October 28, 1945, the appellant married his present wife, who, as shown by the record, is a woman of education and culture. She has a Bachelor of Arts degree from the University of California at Los Angeles and a degree of Library Science from the University of Illinois. She is not now employed and her time is devoted to keeping the home of her husband. Business and professional people in Compton testified that their home is suitable for the rearing of the children, that the neighborhood is satisfactory, and that the reputation and character of the appellant and his wife are good.

One of the controverted issues of this case has developed by reason of the claimed statements of the appellant concerning the twin girls at the time of their mother's death and his subsequent actions. Bertha Halverson, one of the appellees, testified that prior to her return to Iowa and after her daughter's death she talked with the appellant and told him she would take them. Myron H. Halverson, a son of the appellees, testified that he was in California at the time the twins were born and that after the death of their mother he had a conversation with the appel-

lant as to what disposition should be made of the twins. He testified that the appellant stated he had nobody to care for them. This witness further testified that the appellant said it was agreeable that the children come to Iowa and that the grandmother take care of them. This witness also stated that he did not think it was discussed in his presence the length of time the children were to remain in Iowa. Vera Robison, a sister of the deceased Dorothy Pelton, testified that at the time of the death of her sister Robert Pelton made the statement to her: "I want mother Halverson to take the twins back to Iowa and raise them until their education has been completed and they are grown to young womanhood." In her testimony she further states that she told Robert Pelton it was her sister's dying request that the twins be reared by mother Halverson and he said that was all right. She further testified that in 1942 the appellant was in her home with his second wife and he then asked her in case Mr. and Mrs. Halverson died if her brother, sister and herself would be willing to sign papers agreeing to care for the children and that she said she would.

Floyd Robison, the husband of Vera Robison, testified that on the day of the death of Dorothy Pelton, the appellant stated to him that he wished Mrs. Halverson would take the twins and said he had no way to rear them. This testimony was objected to as being immaterial and not of such a nature as to make a disposition of the custody of the children. This witness further testified that the appellant said he would be glad to send the Halversons money to support the twins and that he wanted Mrs. Halverson to take them back to Iowa and rear them until their education had been completed and they were grown into young womanhood. An objection similar to the one previously referred to was made to this testimony. Other testimony of a somewhat similar nature to that of the last two witnesses referred to was presented.

Robert Pelton, the appellant, contradicted in part the testimony given by the appellees and some of their witnesses. Relative to his conversation with Mrs. Halverson subsequent to the death of Dorothy Pelton he testified that Mrs. Halverson said, " 'I want the twins; I want to take care of them for

Dorothy's sake. I don't want anything from you other than their expenses.' " He testified that he replied to her, "I don't have any idea what expense young children are, there never being any in my home or close enough that I know anything about it, so you will have to tell me what that will be, and she said she would." The witness testified that he did not recall the conversation with Vera Robison to which reference has heretofore been made. He did testify, however, that "* * * I believe I did say I wanted mother Halverson to take the twins back to Iowa to raise them until such time as I could take care of them myself. I may have said if Dorothy wanted them to go to her mother and if that was where Dorothy wanted them to go, why, that was where they should go * * *."

As to the claimed conversation with Floyd Robison the witness testified that he didn't believe he made some of the statements attributed to him. He testified, "I probably told him I didn't know how I could take care of them." He also testified that he had told Mrs. Fawcett, a sister of Mrs. Halverson, that he wanted the Halversons to have the children until he could take care of them.

It is disclosed by the appellant's testimony that at the time of the death of his wife, Dorothy Pelton, his mother and father were living in California and had the care of an aunt who was eighty-nine years of age. At about that time his mother and aunt had the flu and his father had to assume the care of them. He further testified that by reason of the necessary care given to his mother and the aunt the father had a slight stroke. It is also shown that the mother had been crippled with arthritis for many years and that she was not able to take care of the twins after Dorothy Pelton's death.

The appellant testified on cross-examination that: "From the date of the birth of the children in 1938 until the time of my second marriage I wouldn't have been able to take care of them. After I married the second wife was the first time I asked that the children be returned to California." As heretofore shown this second marriage resulted in a divorce with the decree becoming a finality in February 1944. It has been further shown that the appellant's naval service continued from

November 1942 until July 1945 and that his subsequent marriage to his present wife did not occur until October 28, 1945. Consequently it would appear that at no time prior to his last marriage was the appellant in a position to furnish a suitable and satisfactory home for the twin girls. This would cover a period of seven years, seven months and fifteen days.

It is appellant's contention in argument that when the twin girls are sixteen years of age the grandmother appellee will be in her eightieth year, if she is then living, and it is contended that the home of the appellant is a more suitable and satisfactory one for the eventual rearing of the two minor girls.

I. It is the contention of the appellant that inasmuch as his domicile is in the state of California the domicile of the twin girls follows that of the father who has not abandoned them and that the bringing of an action in an Iowa court does not confer jurisdiction upon that court to make an adjudication as to the permanent custody of the children. It is his contention that a California court has jurisdiction to pass upon the eventual custody of the minor children because of his and their domicile. Numerous authorities are cited to the effect that the domicile of the child follows that of the surviving parent under the conditions such as prevailed in the instant case. We do not deem it necessary to review all the cited cases inasmuch as there is not much controversy that the domicile of a child ordinarily follows that of a surviving parent. In re Guardianship of Prehoda, 194 Iowa 308, 310, 189 N. W. 719. We do not feel it necessary to determine the question of domicile.

In 43 C. J. S., Infants, 52, section 5, it is stated:

"Jurisdiction to control, and determine and regulate the custody of, an infant is in the courts of the state where the infant legally resides, and the courts of another state are without power in the premises, and cannot obtain jurisdiction for such purpose over persons temporarily within the state. However, if the child is actually within the jurisdiction of the court, the court may determine claims as to his custody, *although his legal domicile is elsewhere, and regardless of the domicile of its parents*; nor, in case of a nonresident parent, is the court's

jurisdiction dependent on a judgment of the foreign state."
(Italics supplied.)

See also Sheehy v. Sheehy, 88 N. H. 223, 186 A. 1, 107 A.
L. R. 635, 639, 39 Am. Jur. 605, section 18.

There is no question in this case that the children had
a legal residence in Iowa by reason of the action of the father
in permitting them to be taken to Iowa and their ten-year
residence there.

II. In 27 Am. Jur., Infants, 830, section 108, it is stated:

"As in the case of controversy between father and mother,
so even as between the father and the parents or other relatives
of the mother of the child, the courts have not hesitated to
deprive the father of his natural right of custody where the
health and well-being of the child have seemed to demand such
a course."

In 48 A. L. R. 139, 141, there are set forth annotations of
cases somewhat similar to the facts in the instant case. In these
annotations there are a few holdings wherein the custody of the
minor child is given to the father but the majority of them
hold that where it is definitely shown that it will be for the
best interests of the minor child the custody will be permitted
to remain with the grandparents or other interested relatives.

The holdings of this court sustain the conclusion that
the interest of the child is the paramount issue to be considered
in cases of this character. In the case of Jensen v. Sorenson,
211 Iowa 354, 364, 233 N. W. 717, 722, we stated:

"It is important, as we have often said, that the custody of
a child should be determined promptly, and that it should be
permanent. The child must be given a place to *grow.* It should
not be too readily transplanted. Nor should it be tossed like
a ball from base to base. For three years this child has been
growing in the Sorenson family, and has found affection there.
In our judgment, no adequate reason is shown in the record
for a change of custody, unless it should be held that the father
has a primary right to such custody. In cases where others than
the parent have maintained the care and custody of a child and

have become bound to it in affection, we have not infrequently held the rights of such custodian to be paramount to the rights of a parent, in a given case."

In our recent case of Herr v. Lazor, 238 Iowa 518, 528, 28 N. W. 2d 11, 16, we stated:

"Each case naturally, as in cases pertaining to other matters, must depend upon the facts. While in cases involving the custody of children the court must and will consider the rights of parents, yet, in this case, as in many cases which have been before this court, we should follow the general rule, well established by authority, that the interest of this minor must control the action of the court. Our review of the evidence convinces us, as it did the trial court, that the child is well placed under the affectionate care of the grandparents, who are able and willing to give him the opportunity to grow up in an atmosphere conducive to his physical and moral welfare; that such affectionate regard is a necessary and vital element in the development of character."

See also Paulson v. Windelow, 236 Iowa 1011, 1017, 20 N. W. 2d 470. Other Iowa authorities on this question are cited in the cases previously referred to and there is no necessity for a review of each of them. The fundamental rule in this state is as heretofore set forth. The question in each case, however, is its general application to the facts presented.

In the instant case we are convinced that the best interests of the children justify their retention and rearing by the grandparents. We are conscious of the advanced age of both of these individuals but we are satisfied that it would not be to the best interests of the girls to have them taken from the home in which they have lived for over ten years and transplant them to a new surrounding and home despite the fact that apparently it would be a satisfactory one if it had been initially possible for these children to have been therein placed. The trial court in the decree and opinion which it filed made some very pertinent and fitting comments relative to its conclusions as to what would be for the best interests of the children as follows:

"The record fails to show that the tangible things to be acquired by the change will be an adequate replacement for the tangible things that will be left behind—the food and lodging and clothing, the school and the church, the material care; while it is certain that the intangible things, the love and devotion, the mutual confidence, the training they receive and the sense of security that are now giving to these girls stability of character and happiness, cannot be replaced without substantial injury to them."

We have not discussed the apparent waiver of the custody of the children by the father. If it was not an actual waiver it was an implied waiver and along with the other facts disclosed may be considered by the court in its ultimate determination of this case. By reason of our conclusions herein expressed the trial court is affirmed.—Affirmed.

All JUSTICES concur.