RUSSELL ELLIS FINKEN, a minor, by ELLIS B. FINKEN, his father and next friend, appellant, v. GLEN PORTER, an individual, guardian of Russell Ellis Finken, a minor, et al., appellees (consolidated with IN RE GUARDIANSHIP OF RUSSELL FINKEN).

No. 48732.

(Reported in 72 N.W.2d 445)

1346

OCTOBER 18, 1955.

Fred Egan, of Missouri Valley, and Russell S. McKay, of Logan, for appellant.

Carl V. Burbridge, of Logan, and Peterson, Smith, Peterson, Beckman & Willson, of Council Bluffs, for appellees.

GARFIELD, J.—By this action in habeas corpus Ellis Finken, surviving parent of Russell Finken, born August 24, 1949, seeks his custody from Esta Jackson, maternal grandmother, and her husband, Jonas. Ellis also asks that Glen Porter, Russell's stepfather, be removed as the boy's guardian. Following trial the district court held it was for the best interests of Russell that his custody be awarded the Jacksons with whom he has been living and denied relief to the father. He has appealed.

Our decisions subsequent to Knochemus v. King, 193 Iowa 1282, 1285, 188 N.W. 957, uniformly treat habeas corpus actions involving custody of minors as equitable in nature, reviewable de novo. Ellison v. Platts, 226 Iowa 1211, 1215, 286 N.W. 413, and citations; Paulson v. Windelow, 236 Iowa 1011, 1016, 20 N.W.2d 470, 473; Lursen v. Henrichs, 239 Iowa 1009, 1013, 33 N.W.2d 383, 385; Durst v. Roach, 245 Iowa 342, 344, 62 N.W.2d 159, 160, and citations.

Although our review is de novo, the trial court's findings are entitled to substantial weight (much weight, according to some of our decisions), because of its better opportunities to weigh the testimony. Justice v. Hobbs, 245 Iowa 707, 708, 63 N.W.2d 882, 883; Watters v. Watters, 243 Iowa 741, 742, 53 N.W.2d 162; Joiner v. Knieriem, 243 Iowa 470, 481, 52 N.W.2d

21, 27, 28; Bell v. Bell, 240 Iowa 934, 938, 38 N.W.2d 658, 660; Lancey v. Shelley, 232 Iowa 178, 187, 2 N.W.2d 781, 785.

In cases of this kind the primary concern of courts is the welfare and best interests of the child. Joiner v. Knieriem, supra, 243 Iowa 470, 480, 52 N.W.2d 21, 27, and citations; Durst v. Roach, supra, 245 Iowa 342, 344, 62 N.W.2d 159, 160; Justice v. Hobbs, supra, 245 Iowa 707, 708, 63 N.W.2d 882, 883.

Although it is presumed the child's welfare will be best subserved in the care and custody of a parent, the presumption is rebuttable. Joiner and Durst cases, supra, and citations. Herr v. Lazor, 238 Iowa 518, 526–528, 28 N.W.2d 11, 15, 16. Paulson v. Windelow, supra, 236 Iowa 1011, 1016, 20 N.W.2d 470, 473. The right of a surviving parent to his child may be relinquished by abandonment, contract or otherwise and will not be enforced where the best interests and welfare of the child call for other care and custody. Lursen v. Henrichs, supra, 239 Iowa 1009, 1014, 1015, 33 N.W.2d 383, 385, 386; Herr v. Lazor, supra; Allender v. Selders, 227 Iowa 1324, 1331, 291 N.W. 176.

The wishes of the deceased mother that her child be cared for by defendants and not by plaintiff and his wife are entitled to weight and consideration. Joiner v. Knieriem, supra, 243 Iowa 470, 482, 52 N.W.2d 21, 28, and citations. Jensen v. Sorenson (Evans, J.), 211 Iowa 354, 361, 362, 233 N.W. 717, 721, says the dying request of a mother as to the future custody of her child, though not controlling or binding on the court, is regarded as of great weight. The statement is repeated in Lancey v. Shelley, supra, 232 Iowa 178, 186, 2 N.W.2d 781, 785.

When we give the trial court's findings the weight they deserve we arrive at the same result. We will refer to testimony from which our conclusion is reached.

Ellis Finken whom we call plaintiff, son of a well-to-do farmer, and Carmen Jackson were married September 16, 1945. As stated, Russell, their only child, was born August 24, 1949. Carmen secured a divorce from Ellis on the ground of cruel and inhuman treatment and Russell's custody was awarded her December 3, 1952. Ellis married Alice Fisher, his present wife, February 14, 1953. Carmen married Glen Porter, a well-to-do farmer and cattle feeder, October 3, 1953. Carmen died January 6, 1954, from injuries sustained in an automobile accident. Por-

ter was appointed Russell's guardian by the clerk of the district court, without notice, January 11, 1954. This habeas corpus action was commenced and motion was filed to remove Porter as guardian and appoint Ellis April 16, 1954. Trial commenced April 28.

Following their marriage in 1945 Ellis and Carmen lived on a farm owned by Ellis' father. For the first three years they seemed to be happy. The first Mrs. Jackson, Carmen's mother, knew of trouble between Ellis and Carmen was in 1949 when Carmen was pregnant. She testifies Ellis "opened the door, threw Carmen in and told me there was my darling daughter." We find no denial of this testimony.

Carmen brought her newborn babe from the hospital to her mother's home where they stayed six days. Ellis stayed there nights. Mrs. Jackson took all the care of the baby during this brief period. When the child was 12 to 14 days old Ellis brought Carmen and little Russell to the Jackson home in the rain. Carmen said Ellis did not love her any more and if she did not get out he would do so.

This separation lasted nearly three months. Neither Carmen nor the baby was well. Mrs. Jackson sat by the baby's bed 17 days rocking him in her arms. The Jacksons took the child to doctors in Council Bluffs and Omaha. Part of this time Carmen was in the hospital. Mrs. Jackson had the burden of the baby's care during much of this three-month period. Ellis came to see him only once or possibly twice for a few minutes during this time.

While Carmen and the child were staying at Jacksons, in the fall of 1949 she learned Ellis was having an intimate affair with Wanda Clark, wife of a neighboring farmer, who left her home with her two children in August 1949. Ellis admits several clandestine visits with Wanda in Omaha and Nevada, Iowa, during August, October and November. Wanda sued her husband for divorce October 1, 1949, in Nevada (Iowa). Clark filed a cross-petition charging his wife with adultery. The cross-petition was withdrawn, however, and a divorce was granted Wanda, February 27, 1950. Custody of the Clark children was awarded Mr. Clark.

Soon after Thanksgiving Carmen and the baby went to live with Ellis in an apartment in Missouri Valley. In February 1950 they returned to the farm. Mrs. Jackson had a part in effecting the reconciliation. A condition of Carmen's going back to Ellis was that he would testify in the Clark divorce suit regarding his illicit relations with Mrs. Clark. Ellis went to Nevada (Iowa) for that purpose, accompanied by Carmen and Mr. Jackson. As stated, Clark withdrew his cross-petition and the divorce was awarded the wife. Before the divorce case was heard Clark executed a covenant not to sue Ellis for alienation of Wanda's affections or criminal conversations between them. Ellis disclaims knowledge of this agreement. Clark says Ellis exacted it from him before he would agree to testify to his relations with Wanda.

While Ellis and Carmen lived in Missouri Valley Mrs. Jackson frequently cared for the baby evenings when the parents went out. In May 1951 a lawful abortion was performed upon Carmen to save her life. In February 1952 Carmen was in the hospital three weeks to a month when a delicate heart operation was performed upon her. Carmen's mother took care of Russell during this time except for a few days when he stayed with Ellis' mother. In May 1952 Carmen again returned to her mother's home with the baby and said there had been trouble and she would not return to Ellis. A divorce action was commenced but it was dropped. After a few days another reconciliation was effected, with Mrs. Jackson's help. Russell remained with Mrs. Jackson several days after Carmen returned to the farm on this occasion.

August 27, 1952, Carmen and the child left Ellis for the last time and returned to the Jackson home. Carmen had filed suit for divorce August 25. As stated, the divorce was granted December 3, 1952. Carmen was granted $1000 permanent alimony. For Russell's support Ellis was to pay $25 a month for two years, $35 a month for three years and then $50 a month until the child reaches majority, is self-supporting or inducted into the service.

Much of the time between August 1952 and October 3, 1953, when she married Glen Porter, Carmen was employed in a drug-store or as a waitress. Carmen and Russell lived with the Jacksons and Mrs. Jackson cared for the child at least during the day. After Carmen and Porter returned from their honeymoon

Russell went to live with them at the Porter farm home. When Carmen died in January 1954, Porter sent for Mrs. Jackson to care for Russell. She stayed at the Porter home seven weeks caring for the boy. Mrs. Jackson then took him to her own home where he has lived continuously.

Ellis joined the naval reserve November 24, 1952, and left for active duty March 3, 1953. He came home on leave in May when he and his present wife had Russell with them two days and a night. Ellis came home for a week end about July 4 but did not see his son then. In September 1953 Ellis was stationed on a battleship which arrived in Korean waters a month later. He had a 30-day leave commencing April 13, 1954. Ellis' naval service was due to expire March 3, 1955. His father testifies Ellis planned to return to the farm upon his discharge. At the trial it was proposed that until then Ellis' present wife keep Russell, if custody were awarded him, in an apartment in Norfolk, Virginia, or in Chicago where Alice's mother lives or in Missouri Valley where her father and stepmother reside.

Ellis made the $25 monthly payments for Russell's support from January to August, 1953. No further payments were made until during the trial when the delinquent payments totaling $225 and $10 interest were made. Failure to make the payments sooner is at least partially excusable by Ellis' absence in the service.

Mrs. Jackson testifies Carmen, whose health was poor, told her many times if anything happened to her she wanted the witness to care for Russell and rear him as if he were her own. Another witness, who kept house for Porter, says that after he and Carmen were married she said if anything ever happened to her she wanted Glen and her mother to take care of Russell.

Since Carmen died Porter has paid the Jacksons $50 a month for Russell's support. He testifies he is willing to continue to do so if the Jacksons are awarded custody. There is no question as to his ability to render such assistance. It seems Porter thinks a great deal of Russell and the feeling is mutual.

There is much evidence regarding the good home the Jacksons have, the excellent care and devotion Russell has had and how happy and contented he is in his present surroundings. The home is modern and in a good neighborhood in Logan. One wit-

ness says, "The child appears happy, contented, clean and well fed. Their home is well furnished, immaculately clean and well kept." There is other similar testimony. Jackson owns the home and 463 acres of farm land. The properties are not heavily incumbered. The Jacksons are in good health. He is 57, she is 47. They have reared eight other children. They are strongly attached to Russell and he to them.

There is also quite a little evidence as to the good reputation of the Jacksons and .Porter and also of Ellis and Alice Finken. This testimony regarding Ellis is weakened by his admitted conduct with Wanda Clark. There is very little evidence as to the kind of home the Finken farm would provide. As previously indicated, Ellis' father is well to do. He owns 630 acres of land. One farm is incumbered for $7000 or $8000. He has one son at home and four other children not there.

We think the above is sufficient reference to the evidence. We feel, as did the trial court, the best interests and welfare of Russell will be subserved by continuing him in the custody of his grandmother and her husband who have given him such excellent and devoted care during so much of his life. Their home has been Russell's home more than any other. That the Jacksons are respected and substantial citizens there can be no doubt.

It is clear Ellis relies mainly upon a parent's presumptive right of custody. As previously indicated we have repeatedly held, especially in our more recent decisions, such presumptive right will not be enforced where the best interests and welfare of the child call for other care and custody. This is the rule generally. 43 C. J. S., Infants, section 7b, page 57; 27 Am. Jur., Infants, section 108 ("Wherever a controversy arises between different claimants to the custody of a child, the probable welfare of the child is the controlling consideration to which all questions of superior legal right are entirely subordinated.").

These are among the precedents that may be cited in support of our conclusion: Werling v. Heggen (Stevens, J.), 208 Iowa 908, 225 N.W. 952; Jensen v. Sorenson (Evans, J.), 211 Iowa 354, 233 N.W. 717; Lancey v. Shelley (Hale, J.), 232 Iowa 178, 2 N.W.2d 781; Paulson v. Windelow (Smith, J.), 236 Iowa 1011, 20 N.W.2d 470; Herr v. Lazor (Hale, J.), 238 Iowa 518, 28

N.W.2d 11; Pelton v. Halverson (Wennerstrum, J.), 240 Iowa 184, 35 N.W.2d 759; Joiner v. Knieriem (Bliss, J.), 243 Iowa 470, 52 N.W.2d 21; Durst v. Roach (Bliss, C. J.), 245 Iowa 342, 62 N.W.2d 159.

We have previously cited herein all these decisions except Werling v. Heggen and Pelton v. Halverson. All are controversies between a father and maternal grandparents or other relatives of a child in which the father was unsuccessful here. In all but Herr v. Lazor and perhaps Durst v. Roach the father was the surviving parent. In the Jensen, Paulson and Durst cases the trial court was reversed. All are actions in habeas corpus except Herr v. Lazor. It, however, is also in equity. There is no dissent to any of these precedents except Lancey v. Shelley. Much of what is said in these opinions might well be repeated here but we will quote from only one of them.

Our unanimous opinion in Pelton v. Halverson, supra, at page 191 of 240 Iowa, at page 763 of 35 N.W.2d, quotes with approval this from 27 Am. Jur., Infants, section 108, pages 830, 831: "As in the case of controversy between father and mother, so even as between the father and the parents or other relatives of the mother of a child, the courts have not hesitated to deprive the father of his natural right of custody where the health and well-being of the child have seemed to demand such a course."

Of course the decision in each controversy of this kind turns largely upon the facts in the particular case.

As indicated at the outset, the trial court declined to remove Porter, the stepfather, and to appoint Ellis, as the boy's guardian. Grounds, if there were any, of the application to remove Porter and appoint Ellis do not appear. It is not shown Russell does not have property or money a guardian should manage.

It may fairly be inferred Ellis' request that Porter be removed and he be appointed guardian is bottomed on his claim to custody in the habeas corpus action. When these two matters were reached for trial defendants' counsel advised the court the same question was involved in both and asked that they be consolidated for trial. This was done without objection from plaintiff's counsel. Plaintiff's opening argument here contains only this reference at its conclusion to the guardianship matter: "For all the reasons urged above Glen Porter should be removed and

the minor's father appointed as guardian." The reasons referred to are those asserted in the habeas corpus action. Plaintiff's reply brief does not amplify his complaint against the appointment.

In view of the above it would seem denial of relief in the habeas corpus action is sufficient basis for denial of plaintiff's application in the guardianship matter. See in this connection In re Guardianship of Lancey, 232 Iowa 191, 195, 2 N.W.2d 787, 789. Further, no adequate grounds appear for reversal of the court's order in the guardianship matter.

We do not ordinarily interfere with an order of this kind where no abuse of discretion is shown. In re Guardianship of Lancey, supra, 232 Iowa 191, 196, 2 N.W.2d 787, 790, and citations. No such abuse appears here. It is clear Porter and the Jacksons are on the best of terms. Porter thinks custody of the boy should remain with the Jacksons and they want Porter to continue as guardian. Ordinarily the duly appointed guardian of a minor is entitled to its custody. In re Adoption of Burkholder, 211 Iowa 1222, 233 N.W. 702. Yet we have held it is not improper for guardianship of the person of a minor and guardianship of its property to be vested in separate persons when the best interests of the ward will be served thereby. Lawrence v. Thomas, 84 Iowa 362, 51 N.W. 11. This is the practical effect of the determination here.

That the original appointment of Porter may have been without notice to Ellis does not entitle him to a reversal of the order refusing to remove Porter and appoint Ellis. That order followed a full hearing, or opportunity therefor, and amounts to a ratification of the order appointing Porter. In re Guardianship of Hruska, 230 Iowa 668, 673, 674, 298 N.W. 664, 667, 138 A. L. R. 1359; In re Adoption of Karns, 236 Iowa 932, 939, 20 N.W.2d 474, 478. See also Larsen v. District Court, 230 Iowa 1100, 1102, 300 N.W. 297, 298.—Affirmed.

All JUSTICES concur except HAYS, J., who dissents.

HAYS, J.—I respectfully dissent.

With the legal propositions enunciated in the majority opinion, as abstract legal propositions, I agree. With the statement of facts I cannot agree, as, in my opinion, it is inaccurate and

much more unfavorable to appellant than is warranted by the record. Neither can I agree with the application of the law to the facts.

I make no attack upon Mr. and Mrs. Jackson. While I doubt if their financial situation is as good as would appear from the majority opinion, the record clearly reveals them to be good citizens well able to furnish a good home to their grandson, for whom they have real affection. Mrs. Jackson, under the record, has given much of her time and strength to her daughter and grandchild during their illness and misfortune. She is truly a typical grandmother.

However, this court is here called upon to determine what, if any, rights the natural father of a young child has as to its care and custody. It is conceded by the majority, purely I am afraid as an abstract legal rule, that a surviving parent is, under our statutes, entitled to such care and custody, subject to the qualification of such right being contrary to the best interest of the child. In determining this question sentiment has no place. As was said in Watters v. Watters, 243 Iowa 741, 744, 53 N.W.2d 162, 163: " 'The unfitness which deprives a parent of the right to the custody of a child must be positive, and not merely comparative.' "

Ellis Finken and Carmen Jackson were married in 1945. He was a young farmer and took his wife to a home on a 183-acre farm, owned by his father, and which he was renting. With reference to this home Mr. Jackson states: "The farm home of my daughter and Ellis was satisfactory. Good enough for anybody." Mrs. Jackson says: "This home was comfortable and well furnished. I had no objections to the farm home. I would say Ellis was a good provider." It is to this same home that Ellis seeks to take Russell. At the time of their marriage, Ellis was told that Carmen had a heart ailment and should not have children. From 1945 until in 1949 they appear to have lived happily together. Russell, the child here in question, was born August 24, 1949. Ellis brought Carmen and the baby directly from the hospital to the Jackson home where they stayed for six days, neither Carmen nor the baby being well. They then returned to the farm. When Russell was about twelve or fourteen days old, Ellis

brought Carmen and the baby to the Jackson home and set them out in the rain. She remained there with the baby until after Thanksgiving, when they returned to the farm with Ellis. During this period Ellis came to the home once and saw and held the baby, after some disagreement with Mr. Jackson. After returning to the farm, they apparently got along pretty well. As Mrs. Jackson says: "Carmen and Ellis would go out in the evenings and they were both bowling and one thing and another."

In May 1951 Carmen became pregnant; and, on the advice of her physician, the baby was taken. She was in the hospital a few days and Mrs. Jackson cared for Russell. In February 1952 Carmen had a heart operation. While she was in the hospital, Russell stayed part of the time with Grandma Finken and part of the time with Mrs. Jackson. From February until May 1952 Carmen and the boy were with Ellis on the farm. In May she returned home for five or six days and then called Ellis to come and get her, which he did. The record is silent as to what caused this short separation. In August 1952 Carmen and Russell left Ellis and came to the Jackson home. A divorce action was commenced, which resulted in a default decree in December 1952, with Carmen obtaining the custody of the boy. The decree provided for a $1000 alimony, which was paid, and $25 per month for child support. Again the record is silent as to the facts and cause for this divorce. It appears without dispute that during the seven years of their married life Ellis paid in excess of $5000 for Carmen's medical and hospital expense, most of which was subsequent to the separation in 1949. Mrs. Jackson states: "We were never asked at any time to assist in the payment of the hospital bills or other expenses of Carmen Finken during the time she was married to Ellis. I am sure they were all taken care of by him. * * * Ellis reimbursed me for all the doctor bills I paid for Russell. He gave me $200 and I turned it over to Carmen."

Following the divorce, Carmen and Russell lived with the Jacksons until her marriage to Glen Porter in October 1953. During this time she worked awhile and then kept house for Mr. Jackson at a home in Omaha. On February 8, 1953, Russell, while riding in a car with some teenagers, one being his aunt, was in an accident in which one person was killed. He sustained

severe injuries and was hospitalized for about ten days. Ellis was at the hospital about every day visiting with Carmen and Russell, when he was able. He offered to pay the hospital and doctor bills but was told that insurance would take care of it. After Carmen's marriage in 1953, she and Russell moved to the Porter farm where they were living at the time Carmen was killed in an auto accident in January 1954. On January 11, 1954, Porter was appointed legal guardian of Russell. Since Carmen's death Porter has paid Mrs. Jackson $50 a month for caring for Russell and says he may continue to do so if Jacksons obtain custody of Russell.

Ellis Finken enlisted in the Naval Reserve in November 1952. He was married to Alice Fisher, his present wife, on February 14, 1953. They took a trip to California. He brought back a complete cowboy outfit for Russell. After the honeymoon they had Russell with them for a few days before Ellis left for active training on March 3, 1953. In May they were home on boot leave and again had Russell for two days and a night. In September 1953 he was assigned to the U. S. S. Wisconsin and sent to Korean waters. While there, and on January 9, 1954, he received a cable from his father telling of Carmen's death. As the ship was due back in home port about April 15, he was denied emergency leave. He obtained leave April 13. On April 15 he was refused the child, who was then staying at Porter's home. He commenced this action April 16, 1954.

Alice Fisher Finken is about twenty-four years of age and this is her first marriage. She has helped her sister rear four children. She is not a total stranger to Russell. There is not a derogatory word against her in this record; in fact, various witnesses state she has always borne an excellent reputation. She expresses a desire to have Russell in their home.

Now turning to the Wanda Clark affair, referred to in the majority opinion. That this was reprehensible on the part of Ellis Finken cannot be denied; and had a divorce followed that affair, and this action then brought, there would, in my opinion, be a reason for denying him custody of this boy. Under such condition it would be somewhat similar to Joiner v. Knieriem, 243 Iowa 470, 52 N.W.2d 21. However, such action was not taken by Carmen. She returned with Russell to their old home and

lived, apparently happy, for three years thereafter. Subsequent to that affair in 1949, she again became pregnant. Subsequent thereto, Ellis expended some $5000 for Carmen on doctor and hospital bills. There is not one word in this record, following the leaving of the baby with the Jacksons when he was fourteen days old, and which was during the Clark affair, that Ellis ever mistreated Russell. Several substantial citizens in the community state that, at least since 1949, Ellis has borne an excellent reputation. The majority opinion refers to a so-called covenant not to sue. The record is that Clark says he signed a paper not to sue Ellis if he appeared as a witness for him in his divorce action. The document, unsigned and not identified as a copy of the one referred to by Clark, was accepted in evidence over proper objection. Apparently the majority opinion deems it competent proof. I do not; but even so, it is only a part of the Clark episode in 1949. Ellis Finken denies he ever saw or signed such a paper. Clark states it was Carmen Finken's idea and not Ellis'.

The majority opinion states: "Ellis made the $25 monthly payments for Russell's support from January to August, 1953. No further payments were made until during the trial when the delinquent payments * * * were made. Failure to make the payments sooner is at least partially excusable by Ellis' absence in the service." What's the record? Ellis, before leaving for the service in March of 1953, asked the bank to make the payments each month from his account. Howard A. Wilding, an official of the bank, testified: "Well, he just said he wanted to leave arrangements to pay twenty-five dollars a month, and I told him ——I said, 'Gosh, we have got to make some limit on it. Supposing something would happen to you?' And he said, well, he didn't know, he said. So I just wrote down six months from then and that's what it says here—August 1." Ellis signed it and the payments were made. Ellis' father inquired at the bank just shortly before Carmen's marriage if Carmen was still drawing the $25 per month, and instructed them to draw on his account, if necessary, to make the payments. So far as the record shows, Ellis had no knowledge that payments were not being made while he was in Korea. The trial court stated he would not listen to this testimony as it made no difference why it was not

paid. Apparently the majority of the members of this court take the same view. This is not an action to collect alimony. If it was, the attitude of the court would be understandable. In my judgment, this testimony was extremely important as bearing upon the father's attitude and feeling of responsibility toward his child.

The majority opinion states that requests made by Carmen to her mother and to a Mrs. Henderson, who had been Porter's housekeeper, are entitled to weight and consideration, citing authorities. They state that in Jensen v. Sorenson (Evans, J.), 211 Iowa 354, 361, 362, 233 N.W. 717, 721, it says *the dying request* of a mother as to the future custody of her child is entitled to great weight. I have no fault with that statement or to other cases cited on this proposition. The testimony is hearsay and was so objected to. Such testimony, when appearing to be made in premonition of death, is taken under an exception to the hearsay rule. Mrs. Jackson states that just before Carmen left on her honeymoon with Porter, she said that if anything should happen to her while on her honeymoon she wanted her (Mrs. Jackson) to care for Rusty. It may be Carmen considered going on a honeymoon as a premonition of death. It was her second one. The statement to Mrs. Henderson was alleged to have been made some time after Carmen and Russell moved out to the Porter farm. In this statement she included Porter with Mrs. Jackson. Again, where is there found any premonition of death? In my opinion such testimony is not competent.

The majority opinion comments upon there being evidence as to the good reputation of the Jacksons and Porter and also of Ellis and Alice Finken, but that regarding Ellis it is weakened by the Wanda Clark episode. That is true, and it is the *single* black mark against him. No mention is made of the fact that, of all the parties involved—Ellis and Alice Finken, Mr. and Mrs. Jackson, and Glen Porter—Porter is the only one concerning whom there is evidence as to the use of intoxicating liquor. He has been convicted of intoxication and of driving while intoxicated. The testimony is that since he married Carmen he has not used it as frequently. Yet, he is Rusty's legal guardian, and, as the majority opinion says, the one Carmen wanted to look after her little boy.

1360

The majority opinion says: "Their home [Jacksons'] has been Russell's home more than any other." That simply is not the record.

I apologize for the length of this dissent; but so strongly do I feel that a terrible injustice results from the majority decision, that a fair and accurate statement of the record is due this father. Only upon the theory that once a man sins he is forever damned and no honest effort for atonement will be considered, can I understand the majority decision.

I would reverse.